**James M. POINDEXTER, Jr., M.D., Plaintiff,**

v.

**AMERICAN BOARD OF SURGERY, INC., Defendant.**

Civil A. No. 1:93–CV–0097–JTC.

United States District Court, N.D. Georgia, Atlanta Division.

June 10, 1994.

---

Phillip A. Bradley, Carl Wilson Mullis, III, Jan James Johnson, Long Aldridge & Norman, Atlanta, GA, Curtis L. Mack, Mack Williams Haygood & McLean, Atlanta, GA, Jeffrey L. Mann, Office of DeKalb County Attorney, Decatur, GA, Paul E. Bateman,

phv, Burke Warren & MacKay, Chicago, IL, for James M. Poindexter, M.D., F.A.C.S.

James B. Hiers, Jr., Susan A. Dewberry, Swift Currie McGhee & Hiers, Atlanta, GA, for American Board of Surgery, Inc.

## ORDER OF THE COURT

CAMP, District Judge.

This action is before the Court on Defendant's Motion for Summary Judgment [# 16], which is **GRANTED.** The Court has also considered the following Plaintiff's motions: Motion for Hearing on Summary Judgment [# 32], which is **DENIED;** Motion for Leave to File Additional Motions [# 42], which is **DENIED** except as to the motion for jury trial; Motion for Jury Trial [# 43], which is **GRANTED;** and Motions for Pretrial Conference [# 47–1], which is **DENIED;** Entry of Scheduling Order [# 47–2], which is **DENIED;** Extension of Discovery Period [# 47–3], which is **DENIED;** Extension of Time to File Pretrial Order [# 47–4], which is **DENIED;** and Motion for Leave to File Surreply Brief [# 52], which is **DENIED.**

### I. BACKGROUND

Plaintiff is a certified general surgeon seeking additional board certification as a vascular surgeon. Defendant American Board of Surgery, Inc. (the "Board") refuses to grant the certification because Dr. Poindexter has not completed a vascular surgery fellowship at an accredited training program. The Complaint, filed January 14, 1993, charges Defendant with antitrust, business tort, and civil rights violations. Plaintiff alleges financial damages in excess of $2 million and seeks injunctive action to force Defendant to administer the certification examination and to award the certificate upon his successful completion of the test.

This case was assigned to an eight-month discovery track, which closed on January 3, 1994. Defendant filed a timely summary judgment motion on January 21, 1994. The Court placed the action on the March trial calendar, but later removed it due to an extension of time to permit Plaintiff to file a summary judgment response. In a joint motion [# 27] filed February 14, Plaintiff asked for an extension through March 7, 1994, stating: "Plaintiff further stipulates that Plaintiff shall file no motion requesting any additional time to respond, beyond March 7, 1994, nor any other motion." Based on this representation, the Court granted Plaintiff's request with the following provision: "And it is further ordered that no motion by Plaintiff for any further extension of time, nor any other motion by Plaintiff, will be considered."

Plaintiff has now engaged new counsel who proposes to submit a revised pretrial schedule, reopen discovery with Defendant and third parties, designate experts, and amend the Complaint to add at least one additional defendant.

### II. PLAINTIFF'S MOTIONS

█ Plaintiff's motions are **DENIED** on two independent grounds. First, Plaintiff promised Defendant that he would refrain from further motions in exchange for Defendant's consent to an extension of time to respond to Defendant's summary judgment motion. The extension was granted by the Court with the express provision that further motions would not be considered. For that reason, Plaintiff's motions are improper.

Second, the Court has examined each of Plaintiff's motions and Defendant's objections, and finds that Plaintiff's requests would cause unwarranted delay as well as prejudice to Defendant. Moreover, the matters Plaintiff seeks to address concerning an alleged failure to adequately prepare for trial resulted merely from what is now characterized as the inadvertence of Plaintiff's previous attorney. The Court sees no substantial reason to permit additional delay and expense in concluding this matter. Plaintiff's motions are **DENIED.**

The single exception is Plaintiff's motion for a jury trial [# 43], which is **GRANTED.** Having considered the five factors enumerated in *Parrott v. Wilson,* 707 F.2d 1262, 1267 (11th Cir.1983), the Court concludes that the general rule should be applied in this case and Plaintiff's belated motion should be granted. Counsel for Defendant straightforwardly admits that she did not conduct discovery in the expectation of a bench trial and

argues only that inadvertence is an insufficient excuse for this late request. Although the Court's interest in enforcing its previous Order prohibiting further motions is strong, Plaintiff's "right" to trial by jury is even more compelling.

### III. *SUMMARY JUDGMENT STANDARD*

■ Rule 56(c), Fed.R.Civ.P., defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." The general rule of summary judgment in the Eleventh Circuit states that the moving party must show the court that no genuine issue of material fact should be decided at trial. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir. 1991). "[U]nless the movant for summary judgment meets its burden under Rule 56, the obligation of the opposing party does not arise even if no opposing evidentiary material is presented by the party opposing the motion." *Id.*

■ While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir. 1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510.

■ Where neither party can prove either the affirmative or the negative of an essential element of a claim, the movant meets its burden on summary judgment by showing that the opposing party will not be able to meet its burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In *Celotex,* the Supreme Court interpreted Rule 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of its claim. Thus, the movant's burden is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

■ In either situation, only when the movant meets this burden, does the burden shift to the opposing party, who must then present evidence to establish the existence of a material issue of fact. *Id.* The nonmoving party must go beyond the pleadings and submit evidence in the form of affidavits, depositions, admissions and the like, to demonstrate that a genuine issue of material fact does exist. *Id.*

### IV. *UNDISPUTED FACTS*

Based on the pleadings, depositions, answers to interrogatories and admissions and affidavits on file, as well as the parties' statements of undisputed material facts and the responses thereto, and viewing all evidence and factual inferences in a light most favorable to the non-moving party, the following facts emerge as undisputed.

Plaintiff received a medical degree from Washington University in 1980. As early as 1983, prior to completing his general surgery residency, Plaintiff investigated and applied for vascular surgery fellowship programs by interviewing at least eighteen different institutions. Plaintiff was offered positions at two programs, both unaccredited. In 1985, Dr. Poindexter completed his general surgery residency at the University of Connecticut, a graduate medical education program accredited by the Accreditation Counsel of Graduate Medical Education ("Accreditation Counsel"). From July, 1985 through June, 1986, Plaintiff attended New York Medical College, an unaccredited vascular surgery

fellowship program.[1] Upon graduation, the school's program director told Dr. Poindexter that Plaintiff's cases would be used to apply for accreditation with the Accreditation Counsel. New York Medical College did apply, but in 1988 the Accreditation Counsel denied accreditation to the school's vascular fellowship program.

In January, 1987, Plaintiff began his career as an assistant professor of surgery at Morehouse Medical School in Atlanta. Dr. Poindexter continued as a full-time faculty member until he went into private practice in July, 1989. He began private practice as a sole proprietorship, doing business as "Midtown Vascular Surgery." Dr. Poindexter is currently the sole shareholder of "Georgia Vascular Surgery," a professional corporation devoted exclusively to vascular surgery services. He and his wife also own "Georgia Vascular Diagnostics, Inc.," a non-invasive vascular laboratory serving two Atlanta area hospitals.[2] Plaintiff has staff and clinical privileges in vascular surgery at nine hospitals in the metropolitan Atlanta area. He is a "specialty provider" for five managed-care organizations. Plaintiff is a member of the Atlanta Vascular Society, the Perpherial Vascular Society, and the American College of Surgeons. Dr. Poindexter has always limited his medical practice to vascular surgery.

Defendant American Board of Surgery (the "Board"), established in 1937, is a private, non-profit corporation that conducts examinations and awards certifications to qualified candidates in the practice of surgery. The Board itself does not provide health care services. The Board is a member of the American Board of Medical Specialties ("ABMS"), an umbrella organization for 24 medical specialty boards. ABMS authorizes its member boards to issue various certificates of qualification. The Board awards a certificate in general surgery, often referred to as a "primary certificate," and also awards certificates in certain surgical subspecialties. One is vascular surgery.

The Board is governed by Directors who serve rotating six-year terms. Directors are elected annually from various national and regional surgical specialty organizations. Except for two salaried administrative positions, Directors are not compensated. Directors have sole authority to establish Board policy. Surgeons who have been awarded certificates by the Board, known as "Diplomates," have no authority or control over Board actions or policies.[3] The Board's Directors are practicing clinical surgeons and physicians involved in medical education. Directors act as examiners for certifying examinations and determine standards for awarding primary and specialty certificates.

Prior to 1981, there were a number of vascular surgery "fellowships" available for post-residency training, but there was no accreditation process and no guiding principles or standards for fellowship program directors to follow. In the words of the Board's present Executive Director, the Board "believed there was need for improvement of the vascular component of general surgery residencies, and also need for improvement of the existing vascular fellowship programs and development of more programs which met the essentials for developing competent vascular surgeons." Griffen Affidavit [# 16], ¶ 11. The Board applied to the American Board of Medical Specialties to issue a general vascular surgery certificate.

Although the Accreditation Council is the governing body for accreditation, the actual program evaluation is performed by the Residency Review Committee ("RRC") for the particular field of medicine involved. For

1. Vascular surgery is one of seven primary components of general surgery. In plain terms, vascular surgery involves the blood vessels, excluding those associated with the brain and heart. During the year he trained at New York Medical College, Plaintiff performed and assisted in reconstructive vascular surgery, peripheral bypasses, microscopic vessel surgery, and trauma cases.

2. As of August, 1993, Georgia Vascular Surgery employed three vascular surgeons, including Plaintiff. In 1992, Georgia Vascular Surgery had a gross profit of over $787,000 on gross income of approximately $851,000. Georgia Vascular Diagnostics had gross receipts of $220,000 and a gross profit of $202,000. Poindexter Depo., pp. 254–55.

3. Plaintiff is a diplomate of the Board, having received the Board's general surgery certificate.

example, surgical residency programs are reviewed and evaluated by the Residency Review Committee for Surgery. There are recognized essentials for residency training programs, and "accreditation" indicates that the program is in substantial compliance with the published requirements. The Board believed, in 1981, that if accreditation was available to vascular surgery fellowship programs, program directors would be encouraged to improve educational and training opportunities to prospective vascular surgeons. Also, by offering a certificate tied to accredited fellowships, the Board hoped to prompt students to seek accredited programs in vascular surgery. *Id.* at ¶¶ 13, 14. The American Board of Medical Specialties approved the issuance of a vascular surgery certificate in 1982. The Board conducted the first examinations and awarded the first certificates in 1983.

The Board aimed to make satisfactory completion of an accredited fellowship program a non-waivable education requirement for receiving its vascular surgery certificate. However, when the first certificates were awarded in 1983, there were no accredited fellowship programs. The Board therefore implemented a transitional scheme, providing certification options to established vascular surgeons and those who had completed non-accredited training programs. One option permitted graduates from so-called "PEEC" approved vascular surgery training programs to take the examination for a vascular certificate, if they also met other requirements. In 1984, there were 56 PEEC approved programs, each having at least one fellowship position and some more than one. Many of the PEEC programs later gained accreditation by the Accreditation Council. For the educational year July, 1984 to June, 1985, there were 36 fellowship positions in 20 accredited vascular surgery programs. For the year July 1985 to June 1986, there were 61 positions in 40 accredited programs.

Another transition period option for satisfying the Board's education requirement was a "grandfathering" plan intended to accommodate those practicing certified surgeons who did not participate in either a PEEC approved or an accredited vascular fellowship. These surgeons could apply for individual consideration, if they had at least five years of practice in general or thoracic surgery as of the cut-off date on June 30, 1989. This interim "practice mode" period extended for six years from the date the certification process was first implemented.

Of the total number of surgeons who finished their fifth year of general surgery training in 1985 (hereinafter "Plaintiff's class"), eleven surgeons, including Plaintiff, attended vascular fellowship programs that were neither PEEC approved nor accredited by the Accreditation Council. The Board denied admission to the examination for the vascular surgery certificate to all eleven, based on their failure to meet the education requirement. Eighty-five surgeons in Plaintiff's class were admitted to the examination; 81 had attended accredited fellowship programs and 4 had completed PEEC approved programs.

Plaintiff became Board certified in general surgery in 1988, but the Board refused to permit him to sit for the vascular surgery examination because he did not attend an accredited fellowship program. Plaintiff is not Board certified in vascular surgery today. However, certification is voluntary and a certified general surgeon is permitted to perform vascular surgery. The Board explains: "[W]hile the fact that a surgeon holds a certificate in the subspecialty of General Vascular Surgery is an indication that the surgeon possessed, at the time the certificate was issued, certain qualifications, the lack of a certificate … is not necessarily an indication that the surgeon is not as qualified to perform general vascular surgery as one who holds the vascular certificate." Griffen Aff. [# 16], ¶ 35. Although Plaintiff has been denied Board certification, Plaintiff's competence as a vascular surgeon is not an issue in this case.

## V. *PLAINTIFF'S ANTITRUST CLAIM*

### A. *Conspiracy in Restraint of Trade*

Simply put, Plaintiff contends that Board certified vascular surgeons enjoy significant competitive advantages over non-certified

vascular surgeons. According to the Complaint:

> Certification in general vascular surgery is a requirement of many hospitals in the metropolitan Atlanta, Georgia area in the granting of general vascular surgery privileges, by physicians in making referrals of patients' cases, by insurance companies in the setting of malpractice insurance premiums, by managed health care providers and health maintenance organizations in contracting for services, by courts and other adjudicative panels in determining the expertise of general vascular surgeons whose testimony is offered as expert witnesses, and by aspiring general vascular surgeons choosing a practice to which to affiliate.

Complaint, ¶ 9. Dr. Poindexter illustrates the nature of the alleged competitive disadvantage by providing undisputed evidence that several large Atlanta hospitals will not grant vascular surgery privileges to a surgeon who is not Board certified or eligible to receive such a certificate. *See* Plaintiff's Statement of Material Facts [# 34], ¶¶ 74–79. Moreover, Plaintiff says that his present vascular surgery privileges have been threatened at his primary hospital, whose by-laws also require specialty certification as a condition to vascular surgery privileges. Complaint, ¶ 30; Statement of Facts, ¶ 82.

Count I of the Complaint charges the Board, its Directors, and the American Board of Medical Specialties with conspiring to restrain trade, in violation of Section 1 of the Sherman Act. Complaint, ¶ 34. Plaintiff initially calls this illegal conduct a "group boycott," referring to an alleged horizontal agreement among competing surgeons to exclude competition by restricting access to the Board's vascular surgery certificate.[4]

Section 1 of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. Thus, Section 1 requires some form of agreement to restrain trade. Courts generally do not distinguish between the terms "contract," "combination," or "conspiracy," often using the terms interchangeably. *See, e.g., Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 445–46 (3d Cir.1977) ("[w]e perceive no distinction between the terms combination and conspiracy").

 This circuit has defined the elements of a conspiracy to restrain trade under Section 1 to include: (1) an agreement to enter a conspiracy; (2) designed to achieve an unlawful objective; and (3) proof of an actual unlawful effect or facts that show a potential for future harm to competition. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir.1993). Unlike Section 2, Section 1 does not demand proof of a specific intent to restrain trade. "A section 1 plaintiff ... need not prove an intent on the part of the co-conspirators 'to restrain trade or to build a monopoly.' So long as the purported conspiracy has an anticompetitive effect, the plaintiff has made out a case under section 1." *Bolt v. Halifax Hosp. Medical Ctr.*, 891 F.2d 810, 819–20 (11th Cir.1990) (citations omitted). However, federal antitrust law imposes a heightened standard of proof on a plaintiff attempting to demonstrate the existence of an agreement to restrain trade with circumstantial evidence. Plaintiff must "introduce evidence that tends to exclude the possibility that the defendants acted independently or legitimately." *U.S. Anchor*, 7 F.3d at 1002.

 As a threshold matter, the parties debate whether Defendant Board is legally capable of conspiring with its Directors to restrain trade. Generally, a corporation and its officers or directors cannot form a Section 1 conspiracy. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769–72, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984). This circuit has determined, howev-

---

4. The Court refuses to analyze this case as a "group boycott" insofar as Plaintiff may be seeking to invoke a *per se* determination of illegality. *See FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 458, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) ("the category of restraints classed as group boycotts is not to be expanded indiscriminately.... Moreover, we have been slow to condemn rules adopted by professional associations as unreasonable *per se*").

er, that an exception to this general rule exists where plaintiff demonstrates that corporate officers have a personal stake in achieving the object of the alleged conspiracy. *Tiftarea Shopper, Inc. v. Georgia Shopper, Inc.,* 786 F.2d 1115, 1116 (11th Cir.1986); *see also Bolt,* 891 F.2d at 819 (holding that a hospital can conspire with members of its medical staff).

■ The nonprofit Defendant in this case is a separate legal entity. Its Directors, who set Board policy and administer certification examinations, are at the same time practicing or academic physicians who compete with non-certified doctors in the marketplace. Because Directors might benefit by excluding competition from other providers of surgical services, the general rule that a corporation cannot conspire with its officers does not apply to this case. The Court finds that Defendant is legally capable of conspiring with its Directors.

■ The fact that the Directors and the Board are capable of conspiring with each other does not mean that every Board action satisfies the conspiracy requirement of Section 1. The Board by its nature involves collective action by individual competitors. Proof of a conspiracy requires a showing that the conspirators had a rational economic motive for entering into the conspiracy, as well as a conscious commitment to cooperate in a scheme designed to achieve an unlawful objective. *Bolt,* 891 F.2d at 819.

■ First, Defendant argues that no legitimate motive exists to conspire because no economic benefit accrues to the individual Directors as a result of their role in setting accreditation standards. The Board itself does not provide health care services and, Defendant says, no Directors practiced surgery in the Atlanta area during the relevant time period. Thus, no individual Director actually competed with Dr. Poindexter. Defendant concludes that because the parties do not directly compete for surgical patients, no rational economic motive exists for the Directors as a group to conspire to deny Plaintiff a vascular certificate.

Defendant's analysis overlooks the fact that the Board sets national standards determining which general surgeons qualify for its specialty certification in vascular surgery. The individual Directors practice surgery in various local areas throughout the country. As the *Bolt* court pointed out, "one of the first principles of economics is the inverse relationship of supply to price." *Bolt,* 891 F.2d at 820. If the Directors, acting together, can prevent non-certified surgeons from competing effectively in local areas like Atlanta, then the Board certified physicians can charge a higher price. Therefore, Defendant's ability to control the supply of certified vascular surgeons may give its Directors a rational economic incentive to conspire against applicants such as Plaintiff.

■ A Section 1 conspiracy also requires Plaintiff to present evidence that tends to exclude the possibility that the alleged co-conspirators acted legitimately. *U.S. Anchor,* 7 F.3d at 1002. In other words, the joint activity or agreement must be designed to achieve an unlawful objective, rather than enhancing competition or promoting procompetitive conduct. Plaintiff has not met this burden.

Courts have long recognized that establishing and monitoring product and service standards is a legitimate and beneficial function of trade and professional associations. *See, e.g., Consolidated Metal Prod., Inc. v. American Petroleum Inst.,* 846 F.2d 284, 294 (5th Cir.1988) ("Even if user reliance gives [Defendant] significant influence over the market, that influence may enhance, not reduce, competition and consumer welfare." *Id.* at 296 (footnote omitted)). Although disappointed competitors sometimes file antitrust actions against associations that refuse accreditation or professional certification, "[r]estrictions on access by imposition of educational and training requirements and a degree of self-regulation are definitional aspects of the term 'profession.'" *Sherman College of Straight Chiropractic v. American Chiropractic Ass'n, Inc.,* 654 F.Supp. 716, 722 (N.D.Ga.1986) (Evans, J.), *aff'd* 813 F.2d 349 (11th Cir.1987). Moreover, in evaluating the antitrust implications of a profession's self-imposed restrictions, "the general presumption is that the public interest is served

by the promotion of enhanced education and training requirements." *Id.*

Plaintiff fails to rebut the general presumption that the Board's certification standards serve competition and the public interest, complaining only that the Board's refusal to waive its educational requirement does not serve *his* interest in expanding his medical practice. However, there is no direct evidence showing that the Board or its Directors desired to achieve an unlawful objective when they devised the requisite educational qualifications or when they denied Plaintiff a certificate. Nor has Plaintiff introduced circumstantial evidence tending to exclude the possibility that the Board acted legitimately. Instead, the record suggests only that Defendant's policies reflect a sensible concern for the quality of specialized medical training and the standards of surgical practice.

Finally, there is no proof that the Board acted to constrain Plaintiff's ability to compete. Hospitals, patients and insurers voluntarily rely on the Board's certification decision, much like an ordinary consumer might rely on a trade group's seal of approval. After the Board expresses its informed opinion regarding the sufficiency of a surgeon's academic training or credentials, users of that information have the sole power to determine whether that surgeon is entitled to patronage, surgical privileges, or preferred insurance rates.[5]

As courts are fond of observing, the antitrust laws protect competition, not individual competitors. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 319, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). In this regard, it is important to note that Defendant Board's recommendations do not have the force of law and do not determine whether a qualified surgeon can practice vascular surgery. Plaintiff has not been foreclosed from competition. By all accounts, Plaintiff is a successful practitioner. The Board's certification procedure was not conceived or applied as an attempt to deny consumers the right to purchase Plaintiff's services, or to require hospitals to exclude Plaintiff from the surgical staff, or to persuade insurance carriers to charge Plaintiff a higher price for malpractice insurance. The Board does not even ask courts to view Plaintiff less favorably as an expert witness. In short, the Board's decision to withhold certification does not restrain Plaintiff from competing as a vascular surgeon and does not impose sanctions on those who use his services. As Judge Easterbrook observed, "[t]here can be no restraint of trade without a restraint." *Schachar v. American Academy of Ophthalmology,* 870 F.2d 397, 397 (7th Cir.1989). The Court concludes that Defendant's restrictive educational standard and its refusal to award Plaintiff its vascular certification does not constitute an unlawful restraint of trade.

### B. *Plaintiff's Standing*

Defendant contends that Plaintiff does not have standing to bring this antitrust action. Specifically, Defendant says Dr. Poindexter has not suffered an antitrust injury and seeks only to enjoy the benefits of Defendant's alleged anticompetitive conspiracy.

Standing is a question of law. *Austin v. Blue Cross & Blue Shield,* 903 F.2d 1385, 1387 (11th Cir.1990). In the antitrust context, standing is a far more complex matter than the usual search for the constitutionally mandated injury in fact. Antitrust standing involves a more comprehensive inquiry, turning on "an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1448 (11th Cir.1991) (denying antitrust standing to physician seeking hospital privileges so as to reap the alleged monopoly profits received by staff radiologists). The analysis requires a court to "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between

---

5. Plaintiff's reliance on *American Society of Mechanical Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), is misplaced. That association's codes, though only advisory, had a "powerful influence: federal regulations have incorporated many of them by reference, as have the laws of most States, the ordinances of major cities, and the laws of all the provinces of Canada." *Id.* at 559, 102 S.Ct. at 1938–39.

them." *Associated Gen. Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983). Ultimately, a court must determine whether the alleged injury derives from some form of anticompetitive conduct and is the kind of injury that Congress intended to redress with treble damages.

*Todorov,* a leading Eleventh Circuit case on standing, defines a two-pronged approach to determine whether a plaintiff is a proper party to bring an antitrust suit: (1) plaintiff must suffer an "antitrust injury," and (2) plaintiff must be an "efficient enforcer" of the antitrust laws. 921 F.2d at 1449. An antitrust injury results from anticompetitive conduct. In the process of evaluating whether plaintiff has suffered an antitrust injury, a court will often resolve one or more elements of the underlying antitrust claim as well. In this case, the Court concluded that there is no factual evidence of an unlawful objective nor proof of an anticompetitive effect arising from the Board's adverse certification decision. Consequently, there is no need to expressly decide the matter of antitrust standing.

## VI. *STATE LAW CLAIMS*

The Court has original jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332. The parties agree that Georgia law applies.

### A. *Tortious Interference*

Count II purports to be a claim for "Intentional Interference With Right to Practice Profession," and Count IV alleges "Tortious Interference With Business Relationships." The parties treat the two counts as the same legal claim.

Plaintiff alleges that "Defendant has intentionally and improperly, without privilege, interfered with Plaintiff's business relationships by inducing third parties not to enter into and continue business relationships with Plaintiff. . . ." Complaint, ¶ 35. Plaintiff does not assert that Defendant has actually contacted his existing or prospective patients, hospitals, or other business associates to induce them not to enter into relations with Dr. Poindexter. Instead, the intentional in-

terference alleged concerns the Board's efforts to promote public recognition of certified doctors, as well as the adverse effects of Defendant's refusal to permit Plaintiff to take the certification examination. Plaintiff explains:

> ABS's refusal to allow Dr. Poindexter to take the vascular surgery exam [ ] has interfered with Dr. Poindexter's advancement in academics and business relations with his former employer, Morehouse Medical School, and with Dr. Poindexter's ability to engage in his business and profession at various hospitals and other health care organizations.

Plaintiff's Response [# 34], p. 21, n. 8.

 Georgia law provides a cause of action for interference with business relationships. To establish a claim for tortious interference with business relations, a plaintiff must prove that the defendant: "(1) acted improperly and without privilege; (2) purposefully, with malice, and with intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) plaintiff suffered some financial injury as a result." *Southern Business Communications, Inc. v. Matsushita Elec. Corp.,* 806 F.Supp. 950, 962 (N.D.Ga.1992) (Carnes, J.) (citing *DeLong Equip. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1518 (11th Cir.1989)).

 Without deciding whether Defendant's actions have "induced" third parties not to enter into business relations with Plaintiff, the Court concludes from a careful review of the record that there is no evidence that Defendant at any time acted with "malice." Although the consequences to Plaintiff may have been adverse, Defendant's decision to adhere to its educational requirement and its subsequent denial of specialty certification falls far short of the type of malicious and wrongful conduct prohibited by Georgia courts. *See generally NAACP v. Overstreet,* 221 Ga. 16, 20–22, 142 S.E.2d 816 (1965). Because Plaintiff has produced no evidence that Defendant acted with malice, he cannot recover for tortious interference with business relations.

## B. *Promissory Estoppel*

Count III contends that, in a letter sent in 1987, Defendant made an unambiguous promise to Plaintiff that Plaintiff was qualified to apply for the vascular surgery certificate. Dr. Poindexter says he relied on this promise and "reasonably chose not to take certain action that might have otherwise made him eligible to apply for the qualifying examinations." Complaint, ¶¶ 33–35.

While in general surgery residency in 1983, Dr. Poindexter learned that the American Board of Surgery was issuing a certificate in vascular surgery. He began to investigate fellowship programs in vascular surgery, having discovered in the Graduate Medical Education Directory (the "Green Book") that there were as yet no accredited programs. By 1984, Plaintiff was seeking an accredited vascular fellowship to satisfy the Board's education requirement to sit for the examination. Plaintiff was accepted by two unaccredited programs, and chose the one he felt had the better prospect of gaining future accreditation. When he accepted a fellowship position at New York Medical College in December, 1984, he knew that the program was unaccredited and had not yet applied for accreditation, "but they had plans to submit their application to ACGME and felt very confident that they would get approval." Poindexter Depo., p. 93. Plaintiff knew that enrolling in an unaccredited program was risky, but explains that "I took the best risk that I had an opportunity to take at that time." *Id.* at p. 95.

Dr. Poindexter attended the fellowship program at New York Medical College from July, 1985 to June, 1986. In March, 1987, he contacted the Board and requested information regarding its vascular surgery examination. In a letter dated March 30, 1987, the Board enclosed a one page form asking about Plaintiff's medical training. Plaintiff submitted the information in early April, indicating that he had finished general surgery residency in 1985 and completed a vascular fellowship at New York Medical College in 1986. Plaintiff was aware when he returned the preliminary evaluation form that the Board required completion of an accredited fellowship program as a prerequisite to sitting for

the examination. On May 8, 1987, the Board sent Plaintiff a form letter stating: "According to the preliminary information which you have provided us, you.... May apply for the Certificate of Special Qualifications in General Vascular Surgery." Plaintiff's Exh. D.

The May, 1987, letter was sent in error. The Board discovered the error eleven months later, in April, 1988. The Director spoke with Dr. Poindexter and wrote him on April 8, 1988, informing him that because his fellowship training was taken at an unaccredited school he could not be admitted to the vascular surgery examination. *See* Plaintiff's Exh. E. When he received the letter acknowledging the Board's error, Plaintiff still anticipated that his unaccredited fellowship program would obtain approval from the accrediting body. Moreover, Plaintiff knew that if New York Medical College's fellowship program subsequently gained accreditation, he would be accepted as a graduate of an accredited program and become eligible for Board certification. Plaintiff did not learn that his fellowship program had been denied accreditation until after he received the Board's April 8, 1988, letter.

Plaintiff contends that he relied on the Board's erroneous May, 1987 letter and took no further action to fulfill the education requirement:

> If the American Board of Surgery had indicated in May 1987 that Dr. Poindexter was not eligible to apply for the board examination in general vascular surgery, Dr. Poindexter definitely would have taken a different course of action. He would not have waited to see if the New York Medical College received accreditation. He would have gone back to various vascular accredited fellowship programs to see whether there were any last minute openings for July 1987 at those institutions.

Plaintiff's Statement of Material Facts [# 34], ¶ 57. Dr. Poindexter explains his failure to enroll in an accredited program after receiving the Board's corrective letter of April, 1988, by stating that his "personal and professional situations had changed significantly." *Id.* at ¶ 64. He had purchased a home in Atlanta and his wife had begun

M.B.A. studies at a local university. Thus, "it would have been extremely burdensome and difficult to have attempted to apply for and complete an ACGME accredited vascular fellowship at that time." *Id.*

Plaintiff appealed the Board's decision, but was denied admission to the examination. He now argues that the equitable doctrine of promissory estoppel should apply to compel Defendant to admit him to the vascular surgery examination.

■ Georgia has codified the common law doctrine of promissory estoppel as articulated in the Restatement of Torts: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." O.C.G.A. § 13–3–44(a). Thus, to prevail on a promissory estoppel claim under Georgia law, plaintiff must prove that: (1) defendant made a promise; (2) expecting plaintiff to rely on the promise; and (3) plaintiff did reasonably rely to his detriment. *See Doll v. Grand Union Co.*, 925 F.2d 1363, 1371 (11th Cir.1991).

■ In this case, Plaintiff's purported reliance was not reasonable. "Promissory estoppel cannot be applied unless the promisee reasonably relied on the promise." *Fidelity & Deposit Co. v. West Point Constr. Co.*, 178 Ga.App. 578, 580, 344 S.E.2d 268 (1986). Defendant's form letter of May, 1987, lacked any indication that it was intended to relieve Plaintiff of the Board's educational requirements concerning accredited fellowship training. Plaintiff had been aware of the accreditation problem since first applying to vascular programs in 1983. The hope that New York Medical College eventually would gain accreditation was a risk he accepted as his best opportunity of qualifying for the examination. Plaintiff knew when he submitted the preliminary form—and when he received the erroneous response—that certification was conditioned on completion of an accredited fellowship. The Court finds that Defendant's promise, assuming it did exist, was so inconsistent with Plaintiff's knowledge of Board policy that reliance would not be reasonable.

Defendant suggests that the more likely explanation for Plaintiff's failure to apply to an accredited program during that eleven month period before the Board corrected its error is simply that Plaintiff was still hoping that his gamble with New York Medical College would pay off and he would not have to interrupt his career to repeat a year of vascular surgery training. Plaintiff responds that the May, 1987, letter "indicated he had already met ABS's training requirements," and so he made other financial and lifestyle commitments instead of applying to another program. Plaintiff's Response [# 34], p. 16. Because Dr. Poindexter knew without question he had not met Defendant's education requirements, interpreting the Board's letter to say that he had defies reasonable comprehension.

## C. *Breach of By–Laws; Civil Rights*

Count V alleges as a cause of action "Breach of By–Laws and Rules and Regulations." Essentially, Plaintiff contends that Defendant incorporated provisions into its bylaws permitting the Board to consider the merits of individual cases and that the Board has failed to do so in this case. Plaintiff points to language in the "Rules Governing Admissibility to the Examinations" which presumably gives the Board flexibility to dictate different admission requirements in individual cases. The parties argue at some length over the legal meaning of the term "and/or" as used in Defendant's rules.

Before undertaking the semantic squabble, Plaintiff observes that the Board's alleged failure to follow its own rules should be considered not as a separate cause of action, but as weighing in the equities of the promissory estoppel claim. The Court agrees that this is the best use of Plaintiff's imaginary tort claim and has given the allegations appropriate consideration. The Court's determination that promissory estoppel does not apply remains unaffected.

Count VI, "Violation of the Civil Rights Act of 1870," was dismissed by stipulation of the parties. *See* Docket [# 19].

## VII. *CONCLUSION*

Whether Plaintiff is qualified to become a "certified" vascular surgeon is not a legal question. This Court has not determined whether Defendant's criteria for certification are appropriate or correct, only that those requirements do not constitute an unlawful restraint of trade. In examining the record, the Court found that Plaintiff failed to meet his burden of setting forth specific facts sufficient to show the existence of a genuine, material issue concerning either Defendant's unlawful objective or an actual anticompetitive effect of the certification scheme.

Plaintiff's state law claims also cannot survive summary judgment. The Court found no evidence of malicious conduct to support Plaintiff's claim of intentional interference and no promise or reasonable reliance to justify invoking equitable estoppel under Georgia law.

Accordingly, Defendant's motion for summary judgment is **GRANTED.** The Clerk is **DIRECTED** to enter judgment accordingly.

**SO ORDERED.**