185 F.3d 606 (6th Cir. 1999)
 AMERICAN COUNCIL OF CERTIFIED PODIATRIC PHYSICIANS AND SURGEONS, PLAINTIFF-APPELLANT (96-2529/2530)/ CROSS-APPELLEE,
v.
AMERICAN BOARD OF PODIATRIC SURGERY, INC., DEFENDANT-APPELLEE; DEFENDANT-APPELLANT (97-1224), AMERICAN PODIATRIC MEDICAL ASSOCIATION, DEFENDANT-APPELLEE/ CROSS-APPELLANT (97-1223).
 Nos. 96-2529, 96-2530, 97-1223 and 97-1224
 U.S. Court of Appeals, Sixth Circuit
 Argued: December 17, 1998
Decided: July 22, 1999
 
 Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 93-72995--Bernard A. Friedman, District Judge.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Mark A. Cantor, Brooks & Kushman, Southfield, MI, H. Laddie Montague, Jr., Patricia D. Gugin (briefed), Berger & Montague, Philadelphia, PA, Alan M. Sandals (argued), Sandals, Langer & Taylor, Philadelphia, PA, for Plaintiff-Appellant/Cross-Appellee.
 Philip J. Kessler (argued and briefed), Laurie J. Michelson (briefed), Butzel Long, Detroit, MI, Gordon J. Walker (briefed), Birmingham, MI, for Defendant-Appellee.
 Thomas M. Hitch (argued and briefed), McGinty, Jakubiak, Frankland, Hitch & Henderson, East Lansing, MI, for Defendant-Appellee/Cross-Appellant.
 Philip J. Kessler (argued and briefed), Butzel Long, Detroit, MI, Thomas M. Hitch (argued and briefed), McGinty, Jakubiak, Frankland, MI, for Defendant-Appellee/Cross-Appellant in No. 96-2530.
 Before: Merritt, Norris, and Gilman, Circuit Judges.
 OPINION
 Alan E. Norris, Circuit Judge.
 
 
 1
 Plaintiff American Council of Certified Podiatric Physicians and Surgeons ("ACCPPS") brought claims under the Sherman Act, the Michigan Antitrust Reform Act, the Lanham Act, and the common law prohibition against intentional interference with prospective economic advantage against the American Board of Podiatric Surgery, Inc., ("ABPS") and the American Podiatric Medical Association ("APMA"). Plaintiff appeals the district court's partial grant of defendants' motion for summary judgment, the grant of the ABPS's renewed motion for judgment as a matter of law following a jury verdict for plaintiff, and the denial of its request for injunctive relief. The ABPS cross-appeals the district court's denial of its motion for attorney's fees. The APMA cross-appeals the denial of its motion for sanctions pursuant to Fed. R. Civ. P. 11. Subsequent to the filing of the briefs in this case, plaintiff filed a motion to strike portions of the ABPS's brief.
 
 I. BACKGROUND
 
 2
 A. Factual Background.
 
 
 3
 i. The parties.
 
 
 4
 The APMA is the oldest and largest organization of podiatrists in the United States. Of the 12,500-13,000 podiatrists in the United States, over 10,000 are members of the APMA. The Council on Podiatric Medical Education ("CPME") is the educational arm of the APMA. The United States Department of Education recognizes the CPME to accredit podiatric colleges, and the CPME accredits the seven colleges of podiatric medicine. The APMA has authorized the CPME to recognize organizations which provide board certification for podiatrists, but the CPME gets no board-recognition authority from the federal government.
 
 
 5
 The ABPS, which has its origins in the APMA, is the oldest and largest podiatrist certification board in the United States. The CPME has approved the ABPS as a certifying board of podiatric surgeons. Over 4,000 podiatrists are currently certified by the ABPS.
 
 
 6
 Plaintiff, younger and smaller than the ABPS, also certifies podiatric surgeons. It was created by and is recognized by the American Association of Podiatric Physicians and Surgeons ("AAPPS"). A third board, the American Podiatric Medical Specialties Board ("APMSB"), also certifies podiatrists, but it is not a party to this litigation. The parties spend much time debating which is the more reputable and professional board, but the merits of their positions are irrelevant to this appeal.
 
 
 7
 ii. The challenged conduct.
 
 
 8
 Plaintiff bases all of its claims on allegedly false or misleading statements made by the ABPS and the APMA. The ABPS sent out three mass mailings over several years to sectors of the health care community. In 1988, the ABPS sent a letter to between 7,000 and 8,000 hospitals and insurance companies concerning podiatrist certification boards. In the fall of 1991, the ABPS sent a second mass mailing to approximately 6,000 hospitals. A third mailing was sent in October, 1992, to insurance carriers and managed care organizations. Along with these letters, the ABPS included informational brochures. In addition to these ABPS mailings, the APMA allegedly sent out materials of its own which disparaged plaintiff and supported the ABPS. The content of these mailings is discussed in more detail later in this opinion.
 
 
 9
 Plaintiff claims that the ABPS and the APMA conspired to issue the challenged statements and thereby to reduce plaintiff's presence as a competitor in the market for podiatrist certification. Not only did the APMA conspire with the ABPS, plaintiff claims, but also it conspired with its own members to falsely disparage plaintiff and undermine its reputation as a certifying board. According to plaintiff, before the mass mailings it was a rising competitor in the market for podiatrist certification, but after the mailings, its market share dwindled, benefitting the ABPS.
 
 
 10
 iii. The ABPS's share of the market.
 
 
 11
 Plaintiff has provided the following undisputed data concerning the market shares of the three certifying boards.
 
 
 12
 Year Total # of ABPS ACCPPS APMSB
 applicants 
1987-88 762 420 (55.1%) 141 201 
1988-89 685 368 (53.7%) 210 107 
1989-90 565 429 (75.9%) 103 33 
1990-91 660 474 (71.8%) 94 92 
1991-92 500 339 (67.6%) 95 67 
1992-93 564 433 (76.7%) 59 72 
1993-94 739 558 (75.5%) 98 83 
1994-95 790 600 (75.9%) 111 79
 
 
 13
 Plaintiff claims that in apparent contradiction to having such a large market share, the ABPS charges approximately twice as much for podiatrists to take its exam than does plaintiff.
 
 
 14
 B. Prior Proceedings.
 
 
 15
 In 1991, plaintiff sued the APMA for violations of the Lanham Act and for intentional interference with business relationships. The parties settled, and plaintiff's claims were dismissed with prejudice on April 17, 1992. In July, 1993, plaintiff filed a six-count complaint against the ABPS and the APMA. Plaintiff alleged violations of the Lanham Act, § 1 of the Sherman Act (agreement in restraint of trade), § 2 of the Sherman Act (illegal monopolization, attempted monopolization, and conspiracy to monopolize), corresponding violations of the Michigan Antitrust Reform Act, and the common law tort of intentional interference with prospective economic advantage. Defendants moved for summary judgment on all counts, and the district court granted the motion with regard to all claims except the Lanham Act claim against the ABPS. The Lanham Act claim was dismissed against the APMA because, according to the district court, all the events on which the APMA's Lanham Act liability was based occurred before April 17, 1992, and the dismissal of the plaintiff's earlier Lanham Act claims against the APMA precluded the later suit. After being dismissed from the case, the APMA filed a motion for sanctions against the plaintiff, pursuant to Fed. R. Civ. P. 11.
 
 
 16
 The remaining parties proceeded to trial on the Lanham Act claims. After the jury returned a verdict for plaintiff, plaintiff requested injunctive relief prohibiting the ABPS from making any further misstatements. Not only did the district court deny plaintiff's request, the court granted the ABPS's renewed motion for judgment as a matter of law. In a separate opinion, the district court denied the APMA's request for sanctions. The ABPS subsequently sought attorney's fees, a request that was also denied.
 
 
 17
 Plaintiff appeals the partial grant of the motion for summary judgment, the grant of the renewed motion for judgment as a matter of law, and the denial of injunctive relief. The APMA cross-appeals the district court's refusal to impose sanctions on plaintiff, and the ABPS cross-appeals the denial of its motion for attorney's fees. Finally, plaintiff asks this court to strike portions of the ABPS's appellate brief.
 
 II. DISCUSSION
 
 18
 A. Plaintiff's motion to strike portions of the ABPS's brief.
 
 
 19
 Plaintiff complains that, when arguing that the district Judge correctly granted the ABPS's motion for judgment as a matter of law, the ABPS cites in its brief affidavits that were not before the jury. In considering whether sufficient evidence was presented to a jury to supporta verdict, a court may not consider evidence not before the jury. See United States v. Bonds, 12 F.3d 540, 552 (6th Cir. 1993) ("A party may not by-pass the fact-finding process of the lower court and introduce new facts in its brief on appeal.") (citation and internal quotation marks omitted). The ABPS quotes from the affidavit of a Dr. Coles, and cites to three other affidavits, although those materials were not presented to the jury in any manner.
 
 
 20
 The ABPS relies upon the affidavits in an impermissible manner. Two of the primary issues on this appeal are whether plaintiff presented sufficient evidence that health care professionals, such as Dr. Coles, were actually deceived by the alleged misrepresentations of the ABPS, and whether such deception of health care professionals caused injury to plaintiff. These affidavits are cited to persuade this court that there was no such deception and that the challenged statements did not adversely affect plaintiff. The ABPS attempts to justify its reference to these materials by arguing that they were submitted in support of its motion for attorney's fees. The portion of the brief in which the affidavits are cited is clearly directed at proving the insufficiency of the evidence presented to the jury, not the frivolousness of plaintiff's case. Because they were not considered by the jury, we have ignored the references to them in this appeal.
 
 
 21
 B. The district court's rulings on the Lanham Act claims.
 
 
 22
 Plaintiff appeals the district court's grant of the ABPS's renewed motion for judgment as a matter of law on the Lanham Act false advertising claim and the denial of its motion for injunctive relief[1]. The Lanham Act provides, in relevant part:
 
 
 23
 (a)(1). Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
 
 
 24
 (B). in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
 
 
 25
 shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 
 
 26
 15 U.S.C. § 1125(a)(1) & (a)(1)(B) (1994). 15 U.S.C. § 1125(a)(1)(B) thus creates a cause of action for false or misleading advertisement.
 
 
 27
 To state a cause of action for misleading advertisement under the Lanham Act, a plaintiff must establish the following: 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff. See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 922-23 (3d Cir. 1990); ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 964 (D.C. Cir. 1990). The third and fifth elements -- deception and injury -- are both components of causation generally. The deception element asks whether the defendant's misstatements caused the consumer to be deceived. The injury element asks whetherthe defendant's deception of the consumer caused harm to the plaintiff. The sort of proof of these elements a plaintiff must show varies depending upon whether damages or injunctive relief is sought.
 
 
 28
 i. The grant of the ABPS's renewed motion for judgment as a matter of law.
 
 
 29
 When a plaintiff seeks an award of monetary damages for false or misleading advertisement under the Lanham Act, he may show either that the defendant's advertisement is literally false or that it is true yet misleading or confusing. See, e.g., Castrol, Inc. v. Pennzoil Co., 987 F.2d 939, 943 (3d Cir. 1993). Where statements are literally false, a violation may be established without evidence that the statements actually misled consumers. See, e.g., Johnson & Johnson, Inc. v. GAC Int'l, Inc., 862 F.2d 975, 977 (2d Cir. 1988); PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 272 (2nd Cir. 1987). Actual deception is presumed. See U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034, 1040 (9th Cir. 1986). Where statements are literally true, yet deceptive, or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception (i.e., evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product). A plaintiff relying upon statements that are literally true yet misleading "cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react." Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 229 (3d Cir. 1990). In addition, a Lanham Act claim must be based upon a statement of fact, not of opinion. Groden v. Random House, Inc., 61 F.3d 1045, 1052 (2d Cir. 1995); Gillette Co. v. Norelco Consumer Prods. Co., 946 F. Supp. 115, 136 (D. Mass. 1996).
 
 
 30
 The district court ruled that all of plaintiff's claims were based upon statements that were either ambiguous or literally true yet misleading and that plaintiff had failed to introduce sufficient evidence of actual deception. Consequently, plaintiff had not introduced sufficient evidence for a reasonable juror to find in favor of plaintiff to justify an award of damages.
 
 
 31
 Judgment as a matter of law is appropriate where "there is no legally sufficient evidentiary basis for a reasonable jury to find on that issue." Fed. R. Civ. P. 50(a)(1). We review de novo these motions with the identical standard used by the district court, and we must view the evidence in the light most favorable to the nonmoving party. Monday v. Oullette, 118 F.3d 1099, 1101-02 (6th Cir. 1997).
 
 
 32
 1. Literally false v. true-but-misleading or ambiguous statements.
 
 
 33
 Plaintiff bases its Lanham Act claim against the ABPS on seven statements. Two of them are found in mass mailings sent in May, 1988, and October, 1992, where the ABPS wrote:
 
 
 34
 Recently, the American Board of Podiatric Surgery has received a number of inquiries from hospitals regarding podiatrists presenting credentials from organizations purporting to be certifying boards.
 
 
 35
 The AMERICAN BOARD OF PODIATRIC SURGERY... is the ONLY approved certifying board for podiatric surgery. The American Board of Podiatric Surgery is approved by the Council on Podiatric Medical Education, which is part of the American Podiatric Medical Association (formerly the American Podiatry Association).
 
 
 36
 First, plaintiff claims the word "purporting" implies that other organizations, such as plaintiff, are not certifying boards, when in fact plaintiff is a certifying board, and thus the statement is literally false. The district court reasoned that because anything "purports" to be what it says it is, the statement was true although misleading, and therefore plaintiff had toprove actual deception[2]. To the contrary, we find that when read in context, the word "purported" means nothing other than "falsely claiming to be." "Purport" carries this connotation on its own, and when coupled with the other sentences in the letter, there can be no doubt that anyone reading the message would believe the ABPS to be saying that these other organizations were not certifying boards. While this is true, however, the statement in context is more a statement of opinion than a statement of fact. The ABPS seems to say that only boards approved by the CPME are truly certifying boards, and only the ABPS is approved by the CPME. As noted previously, such a statement is an inactionable statement of opinion.
 
 
 37
 Second, plaintiff claims that the statement that the ABPS is "the ONLY approved certifying board for podiatric surgery" is literally false. This statement is either ambiguous or true but misleading. It is wholly unclear what it means to be an "approved" board, and so plaintiff must demonstrate that the statement actually deceived consumers into believing something untrue. Alternatively, considering the statement in context, it may mean that only the ABPS is approved by the CPME, which is true. Thus, whether ambiguous or true but misleading, plaintiff must introduce evidence of actual deception to recover damages.
 
 
 38
 Third, in a mailing to insurance carriers on October 1, 1992, the ABPS stated that it "is the only professionally recognized certifying board for podiatric surgery, being recognized by the" CPME. Like "approved" in the previously discussed passage, the phrase "professionally recognized" is ambiguous. To be "professionally recognized," must the ABPS be recognized by most podiatrists? Most people in the medical profession? Some podiatrists? Taken as a whole, the sentence may mean that only boards recognized by the CPME are professionally recognized boards, which is a statement of opinion. Thus, the statement is either opinion or ambiguous, and plaintiff must introduce evidence of actual deception to survive summary judgment.
 
 
 39
 Fourth, in another mailing to hospitals, the ABPS stated that "there has been a proliferation of'self-designated' organizations purporting to have the authority to recognize and certify in podiatric surgery." Plaintiff complains that the term "self-designated" is disparaging. It may be disparaging, but it is also ambiguous. At trial, evidence suggested that to those in the medical community, "self-designated" could refer to boards not recognized by the CPME, which would be all boards other than the ABPS. In context, the most reasonable interpretation of "self-designated" is "not approved by another body." Plaintiff may or may not be approved by another body, depending upon how one looks at its relationship with the AAPPS. The AAPPS created and approved plaintiff, and being approved by the very body that created it might be considered self-designation.In any event, "self-designated" is ambiguous, and therefore plaintiff must show actual deception to prevail.
 
 
 40
 Fifth, plaintiff points to the language found in the mass mailings stating that the "CPME is the accrediting agency for podiatric medicine...." Plaintiff claims this is a false statement. However, the statement is too ambiguous to be literally false because it does not say what the CPME accredits. The CPME does, in fact, accredit all of the colleges of podiatric medicine, and it is the only organization that accredits these colleges. Thus, in a sense the statement is true. At worst it is misleading, and plaintiff must present evidence of actual deception.
 
 
 41
 Sixth, plaintiff challenges the ABPS's statement that "[t]he CPME is the accrediting agency for podiatric medicine, recognized by the U.S. Department of Education and the Council on Post-secondary Accreditation." Plaintiff interprets this passage to mean that the federal government has approved the CPME for recognizing certification boards, which is false. However, this statement does not necessarily stretch as broadly as the plaintiff would have it. The U.S. Department of Education does, in fact, recognize the CPME for the accreditation of post-secondary schools. Thus, the statement is, at worst, true but misleading, and plaintiff must demonstrate actual deception.
 
 
 42
 Finally, plaintiff complains about the ABPS's statement that the "APMA recognizes only the ABPS for certification in podiatric surgery." Unfortunately, it points to no place in the record where this statement may be found. We have found instances where the ABPS has claimed that it is the only board approved by the CPME, which is a true statement. While it may be that this statement implies that there is some sort of process whereby other boards can apply for CPME approval and that the ABPS is the only board to gain such approval, the statement itself is literally true. Thus, at worst it is true yet misleading, and plaintiff must demonstrate actual deception.
 
 
 43
 In considering all the above-challenged statements, we have to keep in mind that one of the key elements of a cause of action for misleading advertising under the Lanham Act is "that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience." See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 922 (3d Cir. 1990) (internal citations and quotation marks omitted) (emphasis added). Here, the intended audience is comprised of hospital administrators, insurance companies, and managed care organizations, a sophisticated group of professionals who presumably have familiarity with the issues involved in board certification. Because we conclude that this intended audience would find all of the challenged statements to be, at worst, either ambiguous or true but misleading, the district court correctly reasoned that plaintiff had to present evidence of actual deception in order to survive the ABPS's renewed motion for judgment as a matter of law and collect damages.
 
 
 44
 2. Evidence of actual deception.
 
 
 45
 Proof of actual deception requires demonstrating that consumers were actually deceived by the defendant's ambiguous or true-but-misleading statements. Successful plaintiffs usually present evidence of the public's reaction through consumer surveys. Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc., 19 F.3d 125, 129-30 (3d Cir. 1994). There must be evidence that a "significant portion" of the consumer population was deceived. See, e.g., William H. Morris Co. v. Group W, Inc., 66 F.3d 255, 258 (9th Cir. 1995)[3].Plaintiff presented no consumer survey or other market research demonstrating that consumers were deceived by any ambiguous or true-but-misleading statement made by the ABPS.
 
 
 46
 The most compelling direct evidence of actual deception plaintiff sets forth is found in a letter sent to the ABPS by a Dr. Coles, who was Vice-President of Medical Affairs at a hospital. Coles wrote: "From what you say, we should not give much, if any, credence to the ACCPPS? I will certainly appreciate any further information you can give us." While this letter may demonstrate some confusion by Coles, it does not show that he was tricked into believing an untruth about plaintiff. And even if Coles were deceived, this one letter is a far cry from demonstrating that a "significant portion" of the consumer population was deceived.
 
 
 47
 Plaintiff argues it presented sufficient evidence of consumer deception in forms other than consumer surveys, market research, or direct evidence that individual consumers were deceived. Plaintiff draws attention to the following evidence:
 
 
 48
 The CPME sent the ABPS a letter telling it not to tell others that the CPME was recognized by the U.S. Department of Education.
 
 
 49
 In 1993, the CPME distributed a brochure clarifying its functions and its relation to the federal government.
 
 
 50
 Evidence was presented suggesting that a member of the California medical licensing board thought that governmental recognition of the CPME extended to regulation of certifying boards.
 
 
 51
 At most, this evidence indicates concern by the CPME and confusion in the California medical licensing board about the ABPS's representation of the CPME's relationship with the U.S. Department of Education, and thus it speaks to only one of the challenged statements. Even as it relates to this one statement, however, plaintiff has not presented sufficient evidence of actual deception to support a finding that a significant portion of the consumers were deceived. None of this evidence demonstrates that those parties plaintiff labels as its consumers -- hospitals, health care providers, and insurance companies -- were deceived.
 
 
 52
 Plaintiff points to cases which indicate that common sense and personal experience can enter into determining whether consumers were deceived. However, none of these cases stand for the proposition that common sense or personal experience alone will suffice for plaintiff to establish actual deception. The court in McNeilab, Inc. v. American Home Prods. Corp., 501 F. Supp. 517, 525 (S.D.N.Y. 1980), reasoned that a court as factfinder may use "experience and understanding of human nature" in determining whether market researchers and expert witnesses have established actual deception, but the case cannot be read for the proposition that common sense can substitute for direct evidence. Rather, in McNeilab, common sense acts as a check on evidence tending to establish actual deception, not a substitute for such evidence. Plaintiff relies upon Getty Petroleum Corp. v. Island Transp. Corp., 878 F.2d 650, 656-57 (2d Cir. 1989), for the proposition that common sense may guide the jury's determination without any consumer witnesses or market surveys, butthat was a case concerning literal falsity, not ambiguous or true-but-misleading statements. When statements are literally false, the potential for actual deception is naturally greater. Thus, Getty Petroleum merely reaffirms the general rule that in cases of literally false statements, evidence of actual deception is not required. See also Federal Trade Comm'n v. Brown & Williamson Tobacco Corp., 778 F.2d 35, 40-42 (D.C. Cir. 1985) (construing the "false advertising" section of the Federal Trade Commission Act and holding that where deception is self-evident, consumer surveys are not required).
 
 
 53
 The district court also ruled that plaintiff had failed to present evidence sufficient for a reasonable jury to find that the alleged deception of consumers had caused it injury. Because we hold that plaintiff failed to present sufficient evidence of actual deception to support an award of damages, we need not consider the second causation issue.
 
 
 54
 ii. The district court's denial of injunctive relief.
 
 
 55
 Plaintiff appeals the district court's denial of its motion for injunctive relief. As noted above, the evidence of causation a plaintiff must introduce to establish a Lanham Act claim varies depending upon the relief sought. Regarding deception, "injunctive relief may be obtained by showing only that the defendant's representations about its product have a tendency to deceive consumers while recovery of damages requires proof of actual consumer deception." Max Daetwyler Corp. v. Input Graphics, Inc., 608 F. Supp 1549, 1551 (E.D. Penn. 1985); see also Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc., 633 F.2d 746, 753-54 (8th Cir. 1980). This lower standard has arisen because when an injunction is sought, courts may protect the consumer without fear of bestowing an undeserved windfall on the plaintiff. See Black Hills Jewelry, 633 F.2d at 753 n.7; J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 27:31, at 27-50 (1998). Although plaintiff need not present consumer surveys or testimony demonstrating actual deception, it must present evidence of some sort demonstrating that consumers were misled.
 
 
 56
 This court reviews a challenge to the grant or denial of a request for permanent injunction under an abuse of discretion standard. In re Dublin Sec., Inc., 133 F.3d 377, 380 (1997). Applying this deferential standard of review, we are unable to say that the district court abused its discretion in denying plaintiff's motion for injunctive relief. Plaintiff's strongest evidence regarding deception involves the ABPS's statements regarding the CPME's relationship with the Department of Education. The CPME directed the ABPS, "In order to avoid the possibility of any confusion in the future... the Council requests that the Board discontinue referencing in the ABPS correspondence and other public documents the recognition of the Council on Podiatric Medical Education by the... U.S. Department of Education." In addition, as noted previously, plaintiff presented evidence suggesting that members of the California medical licensing board were confused concerning the CPME's relationship with the federal government. Although this is some evidence of deception generally, it does little to prove that hospitals, insurance companies, and health care providers -- the entities plaintiff claims are its Lanham Act consumers -- were deceived by the ABPS's statements. The aforementioned letter of Dr. Coles, while perhaps indicating some confusion, is little evidence that consumers were deceived. With such scant evidence of deception, we are unable to say that the district court abused its discretion in denying plaintiff's motion for injunctive relief. Because plaintiff presented insufficient evidence of deception, we do not address the other elements of its Lanham Act claim for injunctive relief.
 
 
 57
 C. The grant of summary judgment in favor of defendants.
 
 
 58
 Plaintiff brought four antitrust claims, alleging violations of §§ 1 and 2 of the Sherman Act and their respective Michigan counterparts.[4] The district court dismissed these claims on defendants' motion for summary judgment, and plaintiff appeals. This court reviews de novo the district court's grant of a motion for summary judgment. Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). A court ruling on a motion for summary judgment must consider all the facts in the light most favorable to the non-movant and must give the non-movant the benefit of every reasonable inference. Allen v. Michigan Dept. of Corrections, 165 F.3d 405, 409 (6th Cir. 1999). A grant of a motion for summary judgment is appropriate only if this court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).
 
 
 59
 Section 1 of the Sherman Act prohibits agreements that result in an unreasonable restraint of trade, while § 2 of the Sherman Act prohibits the willful acquisition of monopoly power. We review the district court's ruling regarding each of these causes of action in turn.
 
 
 60
 i. Agreement resulting in an unreasonable restraint of trade.
 
 
 61
 Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is thereby declared to be illegal." 15 U.S.C. § 1 (1994). In order to have a § 1 violation, there must be an agreement, as § 1 does not encompass unilateral conduct, no matter how anticompetitive. See Nurse Midwifery Assocs. v. Hibbett, 918 F.2d 605, 611 (6th Cir. 1990). Section 1 does not prohibit every restraint on trade, but only those agreements which unreasonably restrain trade. See, e.g., Northwest Wholesale Stationers, Inc., v. Pacific Stationery and Printing Co., 472 U.S. 284, 289 (1985).
 
 
 62
 Plaintiff urges two violations of § 1. First, it argues that the ABPS and the APMA engaged in anticompetitive behavior in the form of a group boycott and conspiracy to exclude plaintiff from the health care market. Second, plaintiff argues that the ABPS conspired with its member diplomates to get hospitals and insurance companies to require or prefer ABPS certification over the certification of other boards such as plaintiff. The district court ruled that there was no triable issue of material fact concerning the existence of an agreement between either the ABPS and the APMA or the ABPS and its member diplomates[5].
 
 
 63
 1. Evidence of an agreement between the APMA and the ABPS.
 
 
 64
 Despite the over-4,000 pages in the parties' Joint Appendix, plaintiff points to virtually no evidence of collusion between the APMA and the ABPS. The plaintiff in a § 1 case must present evidence excluding the possibility that the defendants acted independently of one another; it is not enough to show actions consistent with either independent or conspiratorial action. Riverview Invs., Inc. v. Ottawa Community Improvement Corp., 899 F.2d 474, 484-85 (6th Cir. 1990). Here,both the APMA and the ABPS benefit when the ABPS's credibility within the medical community is strengthened. Thus, it is natural that each organization independently would take steps to promote the ABPS.
 
 
 65
 Plaintiff has failed to carry its burden of presenting evidence that tends to exclude the possibility of independent action. Plaintiff points to evidence in the record tending to establish the following: (1) the APMA determined that it should issue statements warning the public about unrecognized certifying boards; (2) the CPME and the ABPS were on friendly terms; (3) the APMA reviewed some of the ABPS's literature before it was sent out and did not criticize the literature; (4) in a June, 1993, meeting, the APMA agreed to coordinate the text of one of its mass mailings with the ABPS; and (5) in an October, 1993, mailing, the APMA referred negatively to boards not recognized by the APMA. None of this evidence is sufficient to raise a genuine issue of whether the ABPS and the APMA colluded. These facts indicate that the ABPS and APMA had similar goals concerning non-ABPS boards, but the actions of both entities are as consistent with independent action as with collusive action. Even if it is assumed that the October mailing is the result of the June agreement, plaintiff does not indicate in what way the mailing was anticompetitive.[6]
 
 
 66
 We affirm the district court's ruling that plaintiff presented no triable issue of fact concerning an agreement between the ABPS and the APMA.
 
 
 67
 2. Evidence of an agreement between the ABPS and its member diplomates.
 
 
 68
 Plaintiff also alleges that the ABPS conspired with its member diplomates to suppress competition. However, the intracorporate conspiracy doctrine prevents the ABPS from conspiring with its members as a matter of law, because the diplomates and the ABPS are not independent legal entities for purposes of this antitrust claim. In Nurse Midwifery Assocs. v. Hibbett, 918 F.2d 605, 614 (6th Cir. 1990), this court wrote, "Section 1 of the Sherman Act is concerned only with concerted action among competitors and not the coordinated activities that occur within a single firm." Nurse Midwifery dealt with whether members of a hospital's medical staff could conspire with the hospital itself when making employment decisions regarding persons in competition with members of the medical staff. We held that because the staff members were not competitors of the hospital, they could not conspire with the hospital for antitrust purposes. Id. Here, the ABPS does not compete with its member diplomates, therefore antitrust concerns are notraised[7]. While the ABPS members may conspire amongst themselves -- a possibility not alleged by plaintiff -- the diplomates cannot conspire with the ABPS.[8]
 
 
 69
 The district court ruled that there was no genuine issue of material fact with regard to a conspiracy between the ABPS and its members. Plaintiff claims that many ABPS diplomates saw plaintiff's mailings and complained about them to John Bennett. In 1992, the ABPS distributed information packets which urged its members to inform the appropriate persons about various aspects of the ABPS. Evidence suggested that the ABPS's goal in distributing these materials was to encourage hospitals to require ABPS certification in their by-laws. All this may be true, but it presents insufficient evidence of conspiracy between the ABPS and any of its members.
 
 
 70
 In Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984), the Supreme Court considered a resale price maintenance case. In resale price maintenance, a distributor and merchants selling the distributor's product agree that the merchants will not sell the product below a certain price. At issue in Monsanto was whether the plaintiff had presented sufficient evidence of conspiracy between the distributor and the merchants. The Court wrote that where there was only evidence of complaints by merchants to a distributor concerning low-pricing by a maverick merchant, and then a subsequent refusal by the distributor to do business with the maverick, the evidence was insufficient to sustain a finding of agreement between the distributor and the complaining merchants. 465 U.S. at 764. If the rule were otherwise, distributors would be prevented from legally refusing to do business with a particular merchant whenever other merchants had complained about the low-pricing practices of that merchant. Id.
 
 
 71
 Here, plaintiff can demonstrate only complaints by ABPS members and action arguably in conformity with those complaints. As in Monsanto, the action taken by the ABPS is as much in its interest as it is in the interest of its members individually, and plaintiff has not introduced evidence tending to exclude the possibility that the ABPS acted independently and not in concert with its members. See id. at 764 (requiring proof tending to exclude the possibility of independent action). Thus, even if the ABPS could conspire with its members, the district court's grant of summary judgment on the section 1 claims must be affirmed because plaintiff has not generated a genuine issue of material fact regarding conspiracy between the ABPS and its member diplomates.
 
 
 72
 In sum, we hold that plaintiff has failed to create a genuine issue of material fact as to whether the ABPS conspired with either the APMA or its member diplomates. Also, we hold that the ABPS cannot, as a matter of law, conspire with its member diplomates.
 
 
 73
 ii. Abuse of monopoly power.
 
 
 74
 Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States...." 15 U.S.C. § 2. To establish a § 2 violation, a plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481 (1992) (internal quotation marks omitted) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). The district court ruled that there was no triable issue of fact as to whether defendant had monopoly power and therefore granted defendant's summary judgment motion, without reaching the question of whether the alleged misstatements violated section 2, if defendant did have monopoly power.
 
 
 75
 The relevant market includes those products or services that are reasonably interchangeable with, as well as identical to, defendant's product. White & White, Inc. v. American Hosp. Supply Corp., 723 F.2d 495, 500 (6th Cir. 1983). The ABPS produces podiatrist certifications, and plaintiff directly competes with the ABPS in this market, as does a third certification board. Thus, the relevant market is that for the sale of podiatrist certification services. The district court, relying upon a report prepared by the ABPS's expert, ruled that the relevant market must take into consideration the ABPS's influence over the health care market as well as the percentage of podiatrists who are certified by the ABPS every year. This is because plaintiff and the ABPS not only compete for exam takers, according to the court, but also for recognition within the health care community. Plaintiff introduced evidence demonstrating that the ABPS may have a monopoly with regard to the number of exam takers (an average of 69% of all candidates taking an exam for certification in podiatric surgery took the ABPS exam from 1987-1995), but according to the district court, plaintiff would have to produce evidence of the ABPS's monopolization of recognition within the health care community as well. Plaintiff introduced no such evidence, and so the district court granted defendant's summary judgment motion.
 
 
 76
 The district court's reasoning is not persuasive. According to it reasoning, if the ABPS certified 100% of all podiatrists, yet the health care community did not require ABPS certification, the ABPS would not have a sufficient market share to justify a finding of monopoly power. Recognition by the health care community will affect the ABPS's ability to gain monopoly power, as the greater its reputation in that community, the more podiatrists will seek certification by the ABPS. However, recognition within the health care community is not the market within which podiatrist certification boards compete; rather, it is an indicator by which the existing market steers its demand.
 
 
 77
 Monopoly power is the power to control prices and exclude competition. United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 393 (1956). Because a true determination of whether a firm possesses monopoly power hinges upon an analysis of complicated economic factors, courts often look to market share as a proxy for monopoly power. Tarrant Serv. Agency, Inc. v. American Standard, Inc. 12 F.3d 609, 615 (6th Cir. 1993). Plaintiff produced evidencedemonstrating that the ABPS's share of the number of persons taking podiatrist certification exams ranged from 55.1% in 1987, to a high of 76.7% in 1992, with only a slight decrease to 75.9% in 1994. Monopoly power has been found in cases where defendant firm controlled similar portions of the market. See Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 917 F.2d 1413, 1443 (6th Cir. 1990) (when coupled with other evidence of monopoly power, firm with around 60% of the market share can have monopoly power); Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc., 651 F.2d 122, 129 (2d Cir. 1981) (firm with market share between 50% and 70% can sometimes have monopoly power, while a share above 70% is strong evidence of monopoly power).
 
 
 78
 Although the ABPS has a sufficient market share to support a finding of monopoly power, market share is only a starting point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market share. Byars v. Bluff City News Co., 609 F.2d 843, 850-51 (6th Cir. 1979). Plaintiff also claims that the ABPS charges substantially more for its exam than does plaintiff. Although the ABPS may provide more services with its exam (for example, the cost of sending notice of certification to hospitals and insurance carriers) than plaintiff, thereby justifying the higher price, the ABPS does not make this argument. The price difference, coupled with the larger market share, supports plaintiff's claim of monopoly power by ABPS.
 
 
 79
 The APMA argues that because the barriers to entry into the market for certification are low, the ABPS does not have monopoly power. The difficulty of entry into the market is relevant because if entry is easy, even a firm holding a commanding percentage of the market cannot charge a price above the competitive price, for once it does, competitors will enter the market and undercut the firm's price. See United States v. Syufy Enters., 903 F.2d 659, 667 (9th Cir. 1990) (where barriers to entry into the market are low, it is unlikely that a firm may attain monopoly power). The APMA points to the report of Dr. McCarthy, an economist hired by defendants, for the proposition that entry into the podiatrist-certification market is fluid. Dr. McCarthy wrote in his report that "entry and success are both possible, if credibility can be established." However, establishing credibility naturally seems to be a significant barrier to entry, particularly for an enterprise that depends heavily upon reputation, such as certification of medical specialists.
 
 
 80
 Based upon these factors, we reverse the grant of summary judgment on the issue of monopoly power. Although the ABPS may ultimately establish that it does not have monopoly power, considering the evidence in the light most favorable to plaintiff and drawing all inferences in its favor, dismissal of plaintiff's section 2 claim at the summary judgment stage is inappropriate. The district court did not reach the issue of whether the alleged misstatements by the ABPS could serve as a basis for an illegal monopolization claim, and so we need not reach this question either. The district court also granted defendant's summary judgment motion on plaintiff's claim of attempted monopolization. For the same reasons that the monopolization claim survives summary judgment with respect to the monopoly power element, the attempted monopolization claim should survive as well.
 
 
 81
 In addition, plaintiff appeals the district court's grant of summary judgment regarding its claim that the ABPS and APMA conspired to monopolize. Plaintiff points to no evidence to substantiate this claim. Assuming that plaintiff intends the previously discussed evidence of conspiracy to restrain trade to serve as evidence of a conspiracy to monopolize, for the reasons set forth in the section concerning the alleged conspiracy to restrain trade, plaintiff's evidence is insufficient. The districtcourt's grant of summary judgment regarding the conspiracy to monopolize claim is affirmed.[9]
 
 
 82
 iii. Intentional interference with prospective economic advantage.
 
 
 83
 The district court granted defendants' motion for summary judgment regarding plaintiff's claim of intentional interference with economic advantage. When considering claims based upon state law, a federal court must apply the law of that state. Monette v. Am-7-7 Baking Co., 929 F.2d 276, 280 (6th Cir. 1991). To establish a claim of interference with prospective economic advantage in Michigan, a plaintiff must show: (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; (2) that the defendant knew of the business relationship or expectancy; (3) that the defendant intentionally interfered by improperly inducing or causing a breach or termination of the relationship or expectancy; and (4) that the defendant's improper or unjustified interference resulted in injury to the plaintiff. Id. at 281 (citation omitted). The third component of this tort requires the plaintiff to demonstrate illegal or unethical conduct on the part of the defendant. See, e.g., Hutton v. Roberts, 182 Mich. App. 153, 159, 451 N.W.2d 536, 539 (Mich. Ct. App. 1989); Kerasotes Mich. Theatres, Inc. v. National Amusements, Inc., 658 F. Supp. 1514, 1522 (E.D. Mich. 1987), rev'd on other grounds, 854 F.2d 135 (6th Cir. 1988). An antitrust violation such as illegal monopolization would seem to satisfy this requirement. Kerasotes, 658 F. Supp. at 1522.
 
 
 84
 Plaintiff claims that the ABPS interfered in its relationship with podiatrists interested in board certification. The district court ruled that summary judgment was appropriate because, although plaintiff presented evidence of damage to its reputation caused by the ABPS's mailings, plaintiff presented no evidence of an interference with its relationship with podiatrists. However, the evidence discussed in the sections above concerning the Lanham Act claim is sufficient to create a genuine issue of material fact as to whether the ABPS induced hospital administrators and insurance companies not to recognize plaintiff's certification, which in turn decreased the number of podiatrists seeking plaintiff's certification. Although we held above that the district court did not err in granting the ABPS's renewed motion for judgment as a matter of law on the Lanham Act claims, the tort of intentional interference with business relations does not require proof of actual deception. It is enough to show that "the [ABPS's] conduct interfered with the plaintiff's business expectancy...." Monette, 929 F.2d at 282. Thus, we reverse the district court's grant of summary judgment on this claim because plaintiff presented evidence sufficient to raise an issue of material fact as to whether the ABPS interfered with plaintiff's business relations with podiatrists seeking certification. We do not consider whether plaintiff presented sufficient evidence on the other elements of its claim of intentional interference with business relations.
 
 III.
 
 85
 A. Denial of attorney's fees to ABPS.
 
 
 86
 After the district court granted the ABPS's renewed motion for judgment as a matter of law, the ABPS made a motion for an award of attorney's fees pursuant to 15 U.S.C. § 1117(a). The district court denied this motion. Under 15 U.S.C. § 1117(a), prevailing Lanham Act defendants are entitled to an award of attorney's fees in "exceptional" cases. We review a district court's grant or denial of attorney's fees under the Lanham Act foran abuse of discretion. Johnson v. Jones, 149 F.3d 494, 503 (6th Cir. 1998).
 
 
 87
 The ABPS's primary argument is that plaintiff began this litigation knowing that it could not establish the causation issues of actual deception and injury. However, plaintiff had a colorable argument that the challenged statements were literally false and that plaintiff therefore did not have to prove actual deception. Where a plaintiff sues under a colorable, yet ultimately losing, argument, an award of attorney's fees is inappropriate. See Stephen W. Boney, Inc. v. Boney Servs., Inc., 127 F.3d 821, 827 (9th Cir. 1997) (where plaintiff raised debatable issues of law and fact, the case was not "exceptional" so as to justify an award of attorney's fees). Accordingly, we are unable to say that the district court abused its discretion in denying the ABPS's motion for attorney's fees.
 
 
 88
 B. Denial of the APMA's motion for Rule 11 sanctions.
 
 
 89
 After the APMA was dismissed from the case on summary judgment, it made a motion to impose sanctions against plaintiff pursuant to Fed. R. Civ. P. 11. Rule 11, at the time the complaint was filed, provided for the imposition of sanctions against a party unless the filing before the court "is well grounded in fact." The district court denied the motion. We review a denial of a motion for imposition of Rule 11 sanctions for an abuse of discretion. Danvers v. Danvers, 959 F.2d 601, 605 (6th Cir. 1992). The APMA argues that plaintiff could bring no claim against it based upon actions that occurred prior to the date the consent decree in the earlier case was entered, April 17, 1992. It contends that all of the allegations against it either concerned events occurring prior to April 17, 1992, or lack any evidentiary basis. In either case, the APMA asserts, the allegations are frivolous and an imposition of sanctions is required.
 
 
 90
 We affirm the district court's denial of Rule 11 sanctions. While plaintiff is precluded by the 1992 consent decree from seeking damages for injuries caused by any Lanham Act violations prior to this date, it may bring suit for any later violations by the APMA. Plaintiff does not seek reversal of the district court's dismissal of the Lanham Act claim against the APMA, thereby indicating the weakness of this claim, but it points to some post-consent-decree statements by the APMA that it claims could support a Lanham Act action. While the statements it points to constitute slim evidence of a Lanham Act violation, we are unable to say that the district court abused its discretion in denying the motion for Rule 11 sanctions.
 
 IV.
 
 91
 For all the reasons stated above, we grant plaintiff's motion to strike portions of the ABPS's brief. We affirm the district court's grant of ABPS's renewed motion for judgment as a matter of law, the district court's denial of plaintiff's motion for injunctive relief, the district court's denial of the ABPS's motion for attorney's fees, and the district court's denial of the APMA's motion for Rule 11 sanctions. We reverse in part and affirm in part the district court's grant of summary judgment.
 
 
 
 NOTES:
 
 
 [1]
 Plaintiff does not appeal the dismissal, by summary judgment, of its the Lanham Act claims against the APMA.
 
 
 [2]
 Plaintiff points to evidence in the record where a witness testified that purported meant "not genuine," and the gist of plaintiff's argument is that there was sufficient evidence for a jury to find that the statement was literally false. Whether or not a statement is ambiguous would seem to be a question of law, as it is in contract interpretation. See, e.g., Astor v. International Bus. Mach. Corp., 7 F.3d 533, 539-40 (6th Cir. 1993) (under Ohio law, determination of whether a contractual term is ambiguous is a question of law, not fact). On the other hand, the Second Circuit has held that whether or not a statement is facially false is a question of fact. Johnson & Johnson, Inc. v. GAC Int'l, Inc., 862 F.2d 975, 979 (2d Cir. 1988). These two rules do not conflict because determining what meaning(s) words facially convey requires no weighing of evidence, while determining whether facts exist so as to make a statement true does require weighing evidence. Thus, the initial determination concerning whether a statement is ambiguous is a matter of law, while the determination as to whether facts exist so as to justify the statement is a question of fact. The testimony plaintiff points to concerns the initial determination of ambiguity and is therefore irrelevant to the question of whether "purporting" is ambiguous, a question of law.
 
 
 [3]
 One of the initial difficulties with plaintiff's case is that the persons allegedly deceived by defendants' statements are not consumers of any podiatrist certification board. The persons who purchase the services of plaintiff and the ABPS are podiatrists, yet plaintiff alleges that hospitals, health care providers, and insurance companies were misled. Plaintiff's focus upon these other entities is logical because how they perceive the plaintiff will have an effect on its ability to attract podiatrists seeking certification. The less respect these entities have for plaintiff's certification, the less likely it will be that podiatrists will seek plaintiff's certification. Because we affirm the district court's grant of the ABPS's renewed motion for judgment as a matter of law on other grounds, we need not decide whether Lanham Act "consumers" may be entities that do not actually purchase plaintiff's product. We will assume, for purposes of argument, that plaintiff has correctly alleged that hospital administrators and insurance companies are its Lanham Act consumers.
 
 
 [4]
 Because Michigan antitrust law follows federal precedents, our reasoning regarding the federal antitrust claims applies equally to the state antitrust claims. See Mich. Comp. Laws Ann. § 445.784(2) (1998) ("It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes....").
 
 
 [5]
 The district court did not reach the question of whether the alleged agreements, if proved, violated the antitrust laws, as it ruled that there was insufficient evidence of such agreements to generate a genuine issue of material fact. We also do not reach this question.
 
 
 [6]
 Some of plaintiff's allegations are unsupported by the cited evidence in the record.
 According to plaintiff, in August, 1987, the ABPS and the APMA met to discuss a joint mass mailing targeting competing certifying boards. At this alleged meeting, the APMA agreed to assist the ABPS by providing a letter reaffirming the monopoly status of the ABPS, a letter which the ABPS could use in its mailings to hospitals and insurance companies. Also, plaintiff alleges that after the October, 1993, mailing, the ABPS complained to the APMA that the October mailing did not demonstrate sufficiently ardent support for the ABPS. After a consultation, the APMA reached an agreement with the ABPS and in December, 1993, sent a second letter. To further satisfy the ABPS, the APMA included in the second mass mailing a new CPME brochure, also coordinated with the ABPS, which highlighted the ABPS and two other APMA-approved non-surgical boards.
 Most of these allegations are unsupported by the parts of the record cited by plaintiff. Plaintiff indicates neither evidence of a 1987 meeting where the ABPS and APMA met to discuss a joint mailing nor of a letter confirming the monopoly status of the ABPS. Likewise, plaintiff indicates no evidence of a 1993 complaint by the ABPS, consultation between the ABPS and the APMA, or efforts to placate the ABPS. Apparently ABPS executive director John Bennet reviewed the brochure, but nothing indicates that Bennet had any control over its final publication. Plaintiff gives this court no reason to think the brochure was not sent on the APMA's own initiative.
 
 
 [7]
 Plaintiff relies upon Federal Trade Comm'n v. Indiana Fed'n of Dentists, 476 U.S. 447 (1986), in which the Supreme Court considered a Federal Trade Commission ruling that the Indiana Federation of Dentists had conspired with its own members in violation of the antitrust laws. The Court did not consider whether the Federation could conspire with its own members, but stated that the conspiracy it examined was one amongst the members of the Federation. 476 U.S. at 455.
 
 
 [8]
 Some courts employ the independent personal stake exception to the intracorporate conspiracy doctrine, thereby allowing members of professional organization to conspire with that organization. See Poindexter v. American Bd. of Surgery, Inc., 911 F. Supp. 1510 (N.D. Ga. 1994) (applying the rule that where the organization's agents have a personal stake in the principal's anticompetitive acts, the agents may be considered separate legal entities and may conspire with the organization). This court declined to adopt the independent personal stake exception in Nurse Midwifery. 918 F.2d at 615 ("We are not convinced that an agent acting with anticompetitive motives due to some independent personal stake raises sufficient antitrust concerns to warrant abandoning the traditional rule that a principal cannot conspire with one of its agents."). Because the ABPS is controlled by its members and presumably acts in their interests, there is little reason to recognize the ABPS as a legal entity separate from its members for antitrust purposes.
 
 
 [9]
 Plaintiff's claims of illegal monopolization and attempted monopolization under the Michigan Antitrust Reform Act must likewise survive summary judgment, while the state conspiracy to monopolize claims must fail.