**PLASTIC MOLDED TECHNOLOGIES, INC., Plaintiff,**

v.

**CINPRES GAS INJECTION LTD. and CINPRES GAS INJECTION INC., Defendants.**

No. 02–72481.

United States District Court, E.D. Michigan, Southern Division.

Oct. 22, 2003.

Mark A. Cantor, Robert C.J. Tuttle, Ginta D. Kukainis, Brooks & Kushman, Southfield, MI, for Plaintiff.

Gregory J. Boulahanis, Garrison Law House, Dearborn, MI, Mark A. Goldsmith, Honigman, Miller, Bingham Farms, MI, Jonathan F. Putnam, Joseph C. Gioconda, Kirkland & Ellis, New York, NY, John A. Artz, John S. Artz, Robert P. Renke, Artz & Artz, Southfield, MI, Mark A. Goldsmith, Honigman, Miller, Detroit, MI, for Defendant.

### OPINION AND ORDER REGARDING THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

## I. INTRODUCTION

Plaintiff Plastic Molded Technologies, Inc. commenced this suit in this Court on June 13, 2002, asserting federal and state-law unfair competition claims arising from an alleged strategy by Defendants Cinpres Gas Injection Ltd. and Cinpres Gas Injection Inc. to misrepresent their rights to license the use of a so-called "overflow wells" process of gas-assisted plastic injection molding. This Court's jurisdiction rests upon Plaintiff's assertion of a claim under § 43(a) of the federal Lanham Act, 15 U.S.C. § 1125(a).

Two motions currently are pending before the Court. On May 14, 2003, Defendants filed a motion for summary judgment, arguing primarily that the alleged misrepresentations cited by Plaintiff are mere expressions of a layperson's opinion on an unresolved legal matter, and hence are not actionable under the state or federal law of unfair competition. For its part, Plaintiff filed a motion for partial summary judgment on April 29, 2003, requesting that the Court accord preclusive effect to the factual findings in a British proceeding regarding competing claims to the invention of the "overflow wells" process. Both of these motions have been fully briefed by the parties.[1]

On October 16, 2003, the Court met in chambers with counsel for the parties to address these motions. Having reviewed and considered the parties' written submissions and the record as a whole, the Court now is prepared to rule on the parties' motions. This Opinion and Order sets forth the Court's rulings.

---

1. More recently, on June 3, 2003, Defendants filed a motion seeking leave to file a supplemental motion for summary judgment addressing the additional allegations raised in Plaintiff's May 15, 2003 Amended Complaint. This amended pleading cites additional alleged misrepresentations made by Defendants concerning their rights to license the "overflow wells" process. In response to this June 3 motion, Plaintiff contends that a supplemental motion is unnecessary, where the additional materials cited in its Amended Complaint do not materially alter the nature of the unfair competition claims asserted in this case. Indeed, to the extent that the new materials referenced in the Amended Complaint could be viewed as changing the nature of the case, Plaintiff has agreed to limit its claims solely to those alleged misrepresentations cited in the initial Complaint and those which are merely repeated in the new materials. Thus, it appears that Defendants' June 3 motion is moot.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This suit is merely the latest in a series of legal disputes concerning the rights of the parties and related individuals and entities to use and license the "overflow wells" process of gas-assisted plastic injection molding. On March 24, 1992, U.S. Patent No. 5,098,637 ("the '637 patent") issued to James W. Hendry, and this patent addressed the overflow wells or "spillover" process. As will be seen, however, this patent did little to settle the question of who has the right to use or license this process. Nor does the present litigation promise to resolve this issue. Rather, this is merely the latest skirmish in an ongoing battle, one which is nearly certain to continue beyond the conclusion of these proceedings.

### A. The Parties

Through a series of assignments, the '637 patent is now held by non-party Melea Ltd., a Gibralter corporation. Plaintiff Plastic Molded Technologies, Inc., doing business as GAIN Technologies, is Melea's representative in the United States, as well as a licensee under the '637 patent.[2] Defendants Cinpres Gas Injection Ltd., a United Kingdom company, and Cinpres Gas Injection Inc., a Delaware corporation, have been involved in the gas-assisted plastic injection molding industry for many years, dating back to at least the mid–1980s.[3]

### B. Prior Legal Proceedings Involving the "Overflow Wells" Process

In order to place the current suit in its proper context, it is necessary to recount the prior legal proceedings in which the rights to the "overflow wells" process have been contested. First, in January of 1991, Defendants commenced an administrative proceeding in Great Britain under Section 12(1) of the United Kingdom Patent Act, seeking to have one of Defendants' employees, Matthew Sayer, named in place of James Hendry as inventor of the international counterpart to the '637 patent.[4] As the basis for this contention, Defendants maintained that Sayer had developed the overflow wells process back in 1985, and that Hendry, the purported inventor of the '637 patent and its overseas counterpart, had learned of this process at that time through his work alongside Sayer as a consultant to Defendants.

This proceeding in the U.K. Patent Office continued over the next five years, concluding with a May 22, 1996 decision finding that Defendants had failed to es-

---

2. There apparently is some overlap in the ownership or officers of these entities. The initial assignment of rights in the '637 patent was made by inventor James Hendry to Michael Ladney, Plaintiff's president. The rights then passed through a number of entities before being assigned to the current owner of the '637 patent, Melea Ltd.

3. To be accurate, Defendants or their corporate predecessors have been involved in the industry since that time. The precise lineage of the Defendant entities is not entirely clear, and the U.S. corporation, at least, apparently only came into existence in the past few years. For convenience, however, the Court will refer to all of the past and present Cinpres entities as the "Defendants."

4. In fact, this was not the first legal proceeding involving the parties here or related individuals or entities. In 1987, for example, Plaintiff's president, Michael Ladney, brought suit in this District alleging that the "Cinpres Process" licensed by Defendants infringed U.S. Patent No. 4,101,617 held by Ladney. This action was resolved through a consent judgment entered on October 31, 1989, in which Defendants acknowledged that something referred to as the "Cinpres I Process" infringed this patent. According to Plaintiff, however, the various processes referred to in the Consent Judgment all are distinct from the "overflow wells" process at issue here.

tablish that Hendry had learned of the overflow wells process before he left Defendants' employ in 1985. This 31–page decision followed an "unusually complex" presentation of evidence, featuring a "veritable flood of evidence from both sides." (Plaintiff's Motion, Ex. E, 5/22/1996 U.K. Patent Office Decision at 2, 4.) Defendants appealed this decision to the British High Court of Justice,[5] which reversed the Patent Office decision in a ruling issued on November 29, 1996. This decision, in turn, was appealed to a three-judge panel of the Court of Appeal,[6] which unanimously held on July 23, 1997 that the High Court's ruling should be set aside and the Patent Office decision reinstated. In so ruling, the Court of Appeal found the High Court had not given proper deference to the hearing officer's findings of fact during the Patent Office proceeding.[7]

The next proceeding of relevance here was commenced in the U.S. District Court for the Middle District of Florida in early 1997, when the U.K. proceedings were still ongoing. Specifically, Defendants brought suit against Hendry and Melea, alleging in part that Hendry had breached an agreement entered into at the conclusion of his Cinpres employment by treating the overflow wells technology as his own and naming himself as the sole inventor of the '637 patent. Following the favorable conclusion of the U.K. proceedings, Melea filed a motion requesting that the U.K. Patent Office findings be deemed controlling under the doctrine of issue preclusion.[8] The Florida District Court denied this motion, however, holding in a May 6, 1998 Order that the British hearing officer's findings

should not be given preclusive effect because this administrative officer was not in a position "sufficiently analogous to those finders of fact—both judge and jury—upon which we rely in this country," and because of certain purported evidentiary and procedural irregularities in the U.K. administrative proceeding. (Plaintiff's Motion, Ex. I, 5/6/1998 Florida Dist. Ct. Order at 10–11.) Nonetheless, this ruling lacks any precedential force here, by virtue of the Florida District Court's decision to vacate its May 6, 1998 Order at the request of the parties in connection with a November 1998 stipulated dismissal of the Florida suit.

Although the U.K. Patent Office proceeding and the Florida District Court litigation bear the most directly upon the present matter, they by no means constitute all of the legal disputes involving the parties or related entities or individuals. At some point in the mid-to-late 1990s, for instance, Defendants brought a defamation suit against Plaintiff in the British courts, stemming from Plaintiff's March 1996 placement of an advertisement in a European trade journal which, in Defendants' view, suggested that Defendants had infringed Melea's patents. In connection with the settlement of this action in 1999, Plaintiff's counsel sent a letter to Defendants' attorneys stating that Plaintiff was "unaware of any infringement at the time of publication of the advertisement of Melea's patents by your client's Cinpres Process, as subsequently defined by your clients in English and United States proceedings." (Defendants' Motion, Ex. 6,

---

**5.** As noted by Plaintiff, the High Court of Justice is analogous to a U.S. District Court. *See Society of Lloyd's v. Ashenden,* 233 F.3d 473, 476 (7th Cir.2000).

**6.** The Court of Appeal "corresponds to the federal courts of appeals." *Society of Lloyd's,* 233 F.3d at 476.

**7.** Defendants sought leave to appeal to the House of Lords, the British equivalent to the U.S. Supreme Court, *see Society of Lloyd's,* 233 F.3d at 476, but this request was denied.

**8.** As discussed below, Plaintiff seeks this same relief through its present motion.

5/27/1999 Letter at ¶ 4.) In addition, Plaintiff recently brought a patent infringement suit in this District against Steelcase Inc., alleging that this defendant had infringed the '637 patent by using a gas-assisted plastic injection molding process licensed by Defendants.

## C. Defendants' October 6, 2000 Letter

Against this backdrop of prior and pending disputes, the Court turns to the claims and allegations of this case. Specifically, Plaintiff alleges that Defendants have failed in various forums to cast a cloud upon the invention claimed in the '637 patent or Plaintiff's resultant rights in the overflow wells process disclosed in this patent. Plaintiff further alleges that, having exhausted their judicial and administrative remedies, Defendants have now embarked upon a public campaign within the worldwide plastics community to misrepresent their rights to license the overflow wells process.

The evidence of this alleged campaign consists almost exclusively of an October 6, 2000 letter issued by Steven Jordan, Defendants' managing director at the time. Because of the central importance of this letter to this litigation, it is set out in full below:

*Re: Cinpres Technology with Overflow Wells*

Herewith confirmation of the rights of Cinpres Ltd and licensed users of Cinpres Technology and equipment.

1. Since 1985 Cinpres has been including the use of Overflow Wells (for the purpose of extending gas flow through thicker sections or ribs of mouldings) in the Cinpres Technology package.

2. The earliest date of any Melea patent claiming the use of Overflow Wells is 1988, more than 2 years after Cinpres commenced offering licenses containing instructions on the use of Overflow Wells.

3. In October 1990, Mr[.] Ladney issued an open letter "to whom it may concern" stating that Cinpres II In–Article gas injection does not infringe any Gain patents.

4. In June 1999 lawyers acting on behalf of Gain, Melea and Mr[.] Ladney, in order to settle litigation brought by Cinpres Ltd in the High Court in London, admitted that there is no known infringement of any Gain patent by use of Cinpres Technology.

5. Accordingly Cinpres Ltd has the right to continue to grant Technology Licenses which include the use of Overflow Wells.

6. Any Technology licensee of Cinpres Ltd has the legal right to use the Overflow Wells technology as licensed by Cinpres together with gas injection units supplied by Cinpres. This includes the world-wide right to manufacture in or export to North America such mouldings made using Cinpres Technology.

7. As a result of the above, Cinpres can offer its Technology licensees protection with regard to their use of Overflow Wells as licensed by Cinpres Ltd. Any attempt by any third party to interfere with the legal rights of a Cinpres Licensee to use the Cinpres Technology will be vigorously dealt with by Cinpres Ltd. This may include legal action conducted by Cinpres Ltd if so necessary.

8. Cinpres has a successful track record [of] provid[ing] technology for its licensees and protecting their rights to use it. Several legal actions were initiated against

Melea Ltd arising in both successful conclusions for Cinpres and the award of costs and damages against Gain and Melea (some of these costs are still outstanding).

9. Cinpres is a member of BI Group plc and thus has the backing to protect its position and that of its customers.

Further clarification may be obtained from the undersigned.

(Amended Complaint, Ex. A, 10/6/2000 Jordan Letter.)

Through discovery in this case, Plaintiff has identified similar statements in other materials, including an October 2001 announcement and an April 23, 1999 facsimile from Steven Jordan to one of Defendants' current or prospective customers. By Order dated May 9, 2003, the Court granted leave for Plaintiff to file an Amended Complaint referring to these additional materials, and Plaintiff did so on May 15, 2003. As noted earlier, however, Plaintiff has disavowed any intention to expand the scope of this litigation through its reference to these additional materials. Rather, Plaintiff states that these new documents merely serve as additional instances in which Defendants have made the same alleged misrepresentations set forth in the October 6, 2000 letter. Accordingly, the focus of this case remains the October 6 letter.

### III. *ANALYSIS*

#### A. The Standards Governing the Parties' Motions

Through their present motions, each of the parties seeks summary judgment in its favor, either in part or in full, under Fed. R.Civ.P. 56. Under this Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex:*

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994). The Court will apply the above standards in resolving the parties' motions for summary judgment.

## B. Defendants' Motion for Summary Judgment

Defendants aptly characterize Plaintiff's claims in this case as resting upon a theory of "business defamation"—that is, that Plaintiff's business has been harmed as a result of Defendants' alleged misrepresentations concerning the parties' respective rights in the overflow wells process of gas-assisted plastic injection molding. In seeking summary judgment in their favor on these federal and state-law claims of "business defamation," Defendants argue that Steven Jordan's statements in his October 6, 2000 letter addressed only unresolved legal matters, and hence were lawful expressions of a layperson's opinion. Alternatively, Defendants assert that Plaintiff has failed to produce evidence of any actual harm or confusion as a result of the October 6 letter. The Court considers each of these contentions in turn.

**1. The Record Does Not Demonstrate as a Matter of Law that the October 6 Letter Contains Only Expressions of Opinion, as Opposed to False or Misleading Representations of Fact.**

■ Plaintiff's federal "business defamation" claim in this case is governed by the "false advertising" prong of § 43(a) of the Lanham Act, which prohibits any person from making any "false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1). To state a claim under this provision, a plaintiff must show: (i) that the defendant has made false or misleading statements of fact concerning his own product or another's; (ii) that the statement actually deceived or would tend to deceive a substantial portion of the intended audience; (iii) that the statement is material, in that it is likely to influence the deceived consumer's purchasing decisions; (iv) that the statement was introduced into interstate commerce; and (v) that there is a causal link between the challenged statement and harm to the plaintiff. *American Council of Certified Podiatric Physicians & Surgeons v. American Board of Podiatric Surgery, Inc.,* 185 F.3d 606, 613 (6th Cir. 1999). As noted, Defendants challenge Plaintiff's evidence as to the first and fifth elements of this standard.

■ On the first prong of this inquiry, the Sixth Circuit has recognized that "a Lanham Act claim must be based upon a statement of fact, not of opinion." *American Council of Certified Podiatric Physicians,* 185 F.3d at 614. Defendants contend that the challenged statements in the October 6, 2000 letter fail this test, be-

cause they purportedly represent Steven Jordan's opinion as to the present state of legal affairs in the parties' ongoing and as-yet-unresolved dispute concerning their respective rights to license or otherwise control the use of the overflow wells process. In this regard, Defendants maintain that Jordan's statements are legally indistinguishable from the statements of opinion deemed non-actionable in such decisions as *Coastal Abstract Service, Inc. v. First American Title Ins. Co.*, 173 F.3d 725 (9th Cir.1999), *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484 (D.C.Cir.1996), and *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990). Accordingly, the Court turns to this line of cases.

In *Coastal Abstract Service*, for example, the Ninth Circuit addressed statements by the defendant title company to one of the plaintiff's customers, Shearson Lehman Hutton Mortgage Corp., that plaintiff Coastal lacked the requisite California license to act as an escrow agent, that it was not paying its bills, and that Coastal was too small to handle Shearson's business. The Court held that the latter statement was mere "puffery" that "does not qualify as a statement of fact capable of being proved false," while the assertion about Coastal's failure to pay its bills was actionable as "clearly [a statement] of fact, able to be proven true or false." *Coastal Abstract Service*, 173 F.3d at 731–32. Finally, regarding the licensing issue, the Court stated:

California's Financial Code provides that "[i]t shall be unlawful for any person to engage in business as an escrow agent within this State except by means of a corporation duly organized for that purpose licensed by the commissioner as an escrow agent." Cal. Fin.Code § 17200 (West 1982). [Defendant] First American stated [that] Coastal had no such license, and stated or clearly implied that § 17200 required Coastal to

have one for its activities in connection with refinancing California property. The parties continue to dispute whether Coastal's activities fell within § 17200. We need not resolve that question, however. Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact. Statements of opinion are not generally actionable under the Lanham Act .... In the present case, the correct application of § 17200 was not knowable to the parties at the time that First American made the licensure statement. Thus, even if a California court ultimately concludes that § 17200 does not require that a company in Coastal's position obtain an escrow license, the licensure statement as a matter of law could not give rise to a Lanham Act claim.

173 F.3d at 731–32 (footnote and citations omitted).

In so ruling, the Ninth Circuit relied in part on the decision in *Dial A Car, supra.* In that case, the parties disputed the legal effect of a District of Columbia Code provision and corresponding administrative order concerning "Blue Car" transportation services—that is, point-to-point transportation billed on a contract rather than tariff basis. Plaintiff Dial A Car offered only this "Blue Car" service, while the defendants provided both this and regular taxicab services. In Dial A Car's view, "Blue Car" service could be provided only using unmarked luxury cars, as opposed to regular taxicabs which were subject to more stringent regulation. Dial A Car maintained that the defendants had engaged in actionable misrepresentation by advising "Blue Car" customers that their taxicabs could provide the same services as offered by Dial A Car's luxury car fleet.

The D.C. Circuit found it unnecessary to resolve the parties' dispute as to the proper meaning of the relevant D.C. municipal code provision and administrative order, holding that Dial A Car had failed to state a Lanham Act claim in any event:

We need not resolve this question of statutory construction ... because, no matter which view is right, there is no dispute that such a question is within the jurisdiction of the D.C. Taxicab Commission. There is also no dispute that the Commission has not addressed, in an adjudication or any other formal ruling, whether [the defendants'] provision of Blue Car service using regular taxicabs does indeed violate [the D.C. municipal code]. Thus, it appears that [Dial A Car] is simply using the Lanham Act to try to enforce its preferred interpretation of [D.C. regulations] instead of adjudicating the issue before the Commission. We reject such a gambit because we see no reason to reach out and apply federal law to this quintessentially local dispute .... In short, it would be unthinkable for a federal court to suggest that a regulated taxicab company can be held liable under the Lanham Act for failing to anticipate the *court's* subsequent interpretation of a municipal regulation. Rather, we hold that, at a minimum, there must be a clear and unambiguous statement *from the Taxicab Commission* regarding [the defendants'] status before a Lanham Act claim can be entertained.

*Dial A Car*, 82 F.3d at 488–89 (footnote omitted). While allowing for the "hypothetical[ ]" possibility that a municipal regulation "might conceivably be drafted that would be so clear on its face that no good faith doubt concerning its interpretation would be possible, even without an explicit statement from the Taxicab Commission," the Court found that "the regulatory framework in this case is, at the very least, ambiguous with regard to the legality of

[the defendants'] activity." 82 F.3d at 489 n. 3.

Defendants argue that these and other similar decisions are fully applicable here, where Steven Jordan's October 6, 2000 letter addressed legal matters which were unresolved at the time—and, indeed, remain in dispute to this day. In particular, the extent of the parties' respective rights to the overflow wells process has never been conclusively determined in any court or administrative forum. In many instances—the Florida litigation, for example—the parties reached a settlement that left their claims unresolved. Moreover, while the U.K. Patent Office proceeding implicated the parties' respective claims to the invention disclosed in the '637 patent, there was no comparison in that instance of the processes used by Defendants and the one disclosed in the patent to determine whether the former might infringe the latter. Instead, the hearing officer merely concluded that James Hendry had not learned of the process disclosed in the '637 patent during his time with Defendants. Thus, Defendants are able to state without contradiction that their right to use or license their overflow wells technology has never been successfully challenged, and that the '637 patent has never been successfully asserted against Defendants or their customers.

Notwithstanding all of this, however, the Court necessarily must focus on what was ***actually*** said in the October 6 letter, and not merely on what ***could have been*** said within the "opinion" safe harbor of the Lanham Act. In this regard, Defendants have too readily substituted an abstract view of the overall nature of the October 6 letter for a careful analysis of the specific statements actually made in this letter. Steven Jordan did not, after all, merely note the limits to the prior litigation involving the parties' respective

processes and technologies, nor did he simply offer his opinion on the still-open question whether Defendants' technology might infringe the '637 patent. Instead, he endeavored to demonstrate, through reference to prior statements made by Plaintiff's representatives, that Plaintiff itself had *acknowledged* Defendants' right to continue licensing their overflow wells process without running afoul of Plaintiff's patents.

In choosing this particular means to reach the conclusion drawn in the October 6 letter, Steven Jordan traveled beyond the safe harbor of opinion and into the potentially actionable realm of fact. Two of his statements, in particular, are susceptible of being proven true, false, or misleading. First, in paragraph three of the letter, Jordan states: "In October 1990, Mr[.] Ladney issued an open letter 'to whom it may concern' stating that Cinpres II In–Article gas injection does not infringe any Gain patents." (Amended Complaint, Ex. A, 10/6/2000 Letter at ¶ 3.) This statement addresses a purely factual matter, and its truth is readily ascertainable. And, indeed, Jordan has accurately quoted a portion of the October 16, 1990 open letter from Plaintiff's president, Michael Ladney:

> In reference to what is known as the "Cinpres II (In–Article) Process", to our knowledge there is no GAIN patent, issued or pending, which covers this process. However, in making this statement, we take no position on the commercial feasibility of the process, or its patentability to Cinpres.

(Defendants' Motion, Ex. 5, 10/16/1990 Letter at ¶ 2.) [9] Thus, whether or not this statement could be deemed false or misleading, the Court cannot accept Defendants' contention that it is a non-actionable expression of Jordan's opinion.

Likewise, paragraph four of Jordan's October 6 letter states: "In June 1999 lawyers acting on behalf of Gain, Melea, and Mr[.] Ladney, in order to settle litigation brought by Cinpres Ltd. in the High Court in London, admitted that there is no known infringement of any Gain patent by use of Cinpres Technology." (Amended Complaint, Ex. A, 10/6/2000 Letter at ¶ 4.) Again, this assertion addresses a wholly factual matter, and hence can be proven true, false, or misleading. In particular, it may be compared against the underlying letter written by Plaintiff's counsel in May of 1999, in connection with the settlement of a defamation suit brought by Defendants in the British courts concerning an advertisement placed by Plaintiff in a European trade journal in March of 1996. This underlying letter states in pertinent part:

> Our clients recognise that your client appears to believe that it has grounds for complaint. They deny, as stated above, that the advertisement would have been associated with your client or that it was intended to refer to your client, as opposed to anyone else. Nor do our clients accept that the words used have the meaning which you infer. Our clients do accept, however, that as matters have transpired, they can now confirm that they are unaware of any infringement at the time of publication of the advertisement of Melea's patents by your client's Cinpres Process, as subsequently defined by your clients in English and United States proceedings.

---

9. As noted earlier, the October 31, 1989 consent judgment entered at the conclusion of a 1987 suit brought by Ladney against Cinpres defined a variety of terms, including the "Cinpres II (In–Article) Process." (*See* Plaintiff's Br. in Opposition to Defendants' Motion, Ex. 9, 10/31/1989 Consent Judgment at ¶ 8.) Presumably, Ladney intended that this definition should control his use of this term in his October 16, 1990 open letter. As noted by Plaintiff, this definition seemingly does not include any reference to overflow wells.

To the extent that your client believes that a wide allegation of infringement against it could be inferred from the advertisement, without any admission as to liability, our clients renounce any such suggestion and apologise if readers of the advertisement were confused.

(Defendants' Motion, Ex. 6, 5/27/1999 Letter at ¶ 4.) The potential unlawfulness of Jordan's statement in paragraph four of his October 6 letter, therefore, can be determined by reference to the underlying May 1999 letter to which Jordan refers.

Immediately following these two statements on purely factual matters,[10] Jordan states his conclusion in paragraph five of the October 6 letter: "Accordingly Cinpres Ltd has the right to continue to grant Technology Licenses which include the use of Overflow Wells." (Amended Complaint, Ex. A, 10/6/2000 Letter at ¶ 5.) Though this statement, standing alone, might be viewed as an expression of Jordan's opinion, it could also be read in its larger context as stating a logical conclusion that ineluctably follows from the preceding assertions of fact. This statement, after all, begins with the word "[a]ccordingly," and it directly follows assertions that Plaintiff has admitted, on two separate occasions, that Cinpres processes do not infringe any of Plaintiff's patents. Because this is a permissible reading of the October 6 letter, it cannot be said as a matter of law that the letter is merely an expression of a layperson's opinion on an open issue. Rather, construing the letter in a light most favorable to Plaintiff, the Court must inquire whether Jordan's mix of factual assertions, conclusions, and opinion could be deemed a false or misleading representation of fact as to the parties' respective

rights to use or license the overflow wells process.

■ The Court readily concludes that this inquiry cannot be resolved as a matter of law under the present record. First, while the statement in paragraph three of the October 6 letter appears to accurately quote from Ladney's underlying October 1990 open letter, this alone would not preclude a trier of fact from finding that this statement is misleading. This statement, like Ladney's underlying letter, refers to the "Cinpres II In–Article" process, but this term is nowhere defined or explained in the October 6 letter. Because the entire letter addresses the matter of overflow wells—and, indeed, is captioned "Cinpres Technology with Overflow Wells"—a reader reasonably could assume that the "Cinpres II In–Article" process involves overflow wells. Yet, Plaintiff states without contradiction that it does not. In this event, paragraph three of the October 6 letter would seem to be utterly out of place in a discussion of overflow wells, but a reader who was unfamiliar with the details of the "Cinpres II In–Article" process might nonetheless conclude that Plaintiff had acknowledged Defendants' rights in the overflow wells process. Plainly, this factual issue must be left for the trier of fact to resolve.

Likewise, the trier of fact must decide whether paragraph four includes a false or misleading representation of fact. The 1999 letter cited by Jordan states that Plaintiff was unaware in *March of 1996* of any infringement of Melea's patents by the *"Cinpres Process,"* as this latter term was "subsequently defined by [Defendants] in English and United States proceedings." Nearly all of the limiting and qualifying

---

10. Paragraphs one and two also deal with factual matters—in particular, the date upon which Defendants first incorporated overflow wells into their "Cinpres Technology" package, and the earliest date of any Melea patent claiming the use of overflow wells. Thus, it would appear that these statements also may be proven true, false, or misleading. The Court finds it unnecessary to address these statements, however.

language of the 1999 letter is omitted from Jordan's paragraph four, including the temporal limitation, the reference to the defined term "Cinpres Process," and the source from which this definition could be gleaned. Instead, Jordan merely states that Plaintiff's counsel admitted in June of 1999 "that there is no known infringement of any Gain patent by use of Cinpres Technology."

Thus, the determination of the lawfulness of this statement will turn upon the significance of Jordan's omissions. This, in turn, depends upon such questions as whether the state of Plaintiff's knowledge changed between 1996 and 1999, and whether the term "Cinpres Process" in the 1999 letter was meant to encompass the use of overflow wells. As to the latter point, at least, Plaintiff notes that Steven Jordan provided a less-than-satisfactory explanation at his deposition:

Q: Sir, tell me in any definition given by Cinpres in English and United States proceedings I can find a definition of the Cinpres process that refers to overflow wells.

A: I haven't done the study as it relates to this document [i.e., the 1999 letter].

(Jordan 2/13/2003 Dep. at 91.) Plainly, having been embroiled for over a decade in

disputes with Plaintiff concerning the overflow wells process, Jordan should have been in a position to know or ascertain whether he was accurately characterizing Plaintiff's "no known infringement" admission in the 1999 letter. The record before the Court, however, does not permit the resolution of this issue one way or the other as a matter of law.

■ All of these questions of fact surrounding the specific statements made in the October 6 letter, and particularly in paragraphs three and four, defeat Defendants' appeal to the safe harbor accorded to opinion under the Lanham Act. Perhaps Defendants can produce sufficient evidence as to the meaning of various terms and the surrounding context to persuade the trier of fact that Steven Jordan was expressing a tenable personal belief about the statements made by Plaintiff's representatives on prior occasions. Alternatively, Plaintiff might persuade the trier of fact that Jordan sought to mislead his readers by capitalizing on their lack of familiarity with the precise definitions of the "Cinpres Process," the "Cinpres II In–Article Process," and the "Cinpres Technology," and inviting these readers to assume that each of these processes involve overflow wells.[11] In any event, these issues cannot be resolved as a matter of law at this juncture.[12]

---

11. Indeed, Plaintiff aptly notes that Defendants have employed a similar strategy in their statements to the Court, such as the statement in their brief in support of their motion that "[t]he October 6 letter also relies on the indisputable fact that on numerous occasions throughout the years, the Plaintiff and its principal Mr. Ladney have openly admitted that Cinpres does not infringe the '637 patent." (Defendants' Motion, Br. in Support at 11.) As the foregoing makes clear, no such broad admission appears in the record. Rather, Plaintiff has merely admitted its unawareness as of certain specified times that this or other patents had been infringed by certain specified Cinpres processes.

12. The foregoing discussion has been limited exclusively to federal law, and the parties likewise have devoted little attention to Plaintiff's common-law claim of unfair competition under Michigan law. The Sixth Circuit has stated, however—and the parties seemingly agree—that "[t]he analysis of a claim under Michigan's law of unfair competition is similar to the analysis of a federal Lanham Act claim." *Murray Hill Publications, Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 635 (6th Cir.2001); *see also Two Men and a Truck/International Inc. v. Two Men and a Truck/Kalamazoo, Inc.*, 949 F.Supp. 500, 503 (W.D.Mich. 1996). Accordingly, it follows that Plaintiff's common-law claim also survives summary judgment on this issue.

## 2. Plaintiff Has Produced Evidence of a Causal Link Between the Challenged Statements in the October 6 Letter and Harm to Its Business.

 As the next ground for their summary judgment motion, Defendants argue that Plaintiff has failed to produce evidence that could establish the fifth element of its Lanham Act claim—namely, the existence of a causal link between the challenged statements in the October 6 letter and harm suffered by Plaintiff. *See American Council of Certified Podiatric Physicians*, 185 F.3d at 613.[13] The Court finds, however, that Plaintiff has produced sufficient evidence to survive summary judgment on this point.

First, as pointed out in Plaintiff's response to Defendants' motion, the deposition testimony of Michael Ladney is replete with statements that the release of the October 6 letter had a negative impact upon Plaintiff's licensing program and "hurt our business substantially." (Ladney 3/17/2003 Dep. at 191–94.) Although these statements perhaps are lacking in detail, the same cannot be said of the deposition testimony of Jochen Rehders, a licensing representative for Melea Ltd. Specifically, Rehders identified one customer, Möller Tech, that stated its unwillingness to purchase a license under the '637 patent in light of the statements made by Defendants, and he identified another customer, Kendrion, that was given a discount on the basis of the October 6 letter. (*See* Rehders 5/30/2003 Dep. at 53, 57–58.)[14]

Defendants' only response to this evidence is the conclusory assertion that the harm alleged by Plaintiff is "spurious." (Defendants' Reply Br. at 4.) However little weight Defendants might give to this evidence, the Court may not discount it at the summary judgment stage of this litigation. Accordingly, Plaintiff having produced some evidence of the requisite causal link between the statements in the October 6 letter and harm to its business, Defendants are not entitled to summary judgment in their favor on Plaintiff's Lanham Act or common-law claims of unfair competition.

---

13. Although their motion is not entirely clear on this point, it appears that Defendants also mean to challenge Plaintiff's evidence on the "actually deceives or tends to deceive" prong of the Lanham Act standard. Where a statement is literally false, however, "a plaintiff need not demonstrate actual customer deception in order to obtain relief under the Lanham Act." *Balance Dynamics Corp. v. Schmitt Industries, Inc.*, 204 F.3d 683, 693 (6th Cir. 2000); *see also American Council of Certified Podiatric Physicians*, 185 F.3d at 618. For the reasons stated earlier, the Court finds that issues of fact remain as to whether Jordan's statement in paragraph four of his October 6 letter, at least, could be viewed as literally false, in light of its reference to "Cinpres Technology" versus the "Cinpres Process" and its omission of other limiting information. In any event, the record includes testimony from Plaintiff's representatives recounting instances in which they were forced to address customer concerns about the statements made in the October 6 letter. (*See, e.g.*, Rehders 5/30/2003 Dep. at 57–58, 60; Ladney 3/17/2003 Dep. at 195.) This testimony suffices to raise an issue of fact as to actual customer deception.

14. Moreover, though Plaintiff has not raised the point, the Sixth Circuit has held that a Lanham Act plaintiff may recover "damage control" expenses incurred in addressing the false or misleading statements made by the defendant. *See Balance Dynamics*, 204 F.3d at 689–92. These expenses are recoverable even in the absence of evidence of actual confusion or "marketplace damages," such as lost sales, profits, or goodwill. 204 F.3d at 691–92. The record here lends some support to this theory of recovery, as Plaintiff's representatives clearly were called upon to address with their customers the statements made in the October 6 letter.

## C. Plaintiff's Motion for Partial Summary Judgment

■ Finally, in its motion for partial summary judgment, Plaintiff requests that the Court apply the doctrine of issue preclusion—or, as it is sometimes referred to, collateral estoppel—to accord preclusive effect to certain factual findings in the U.K. Patent Office proceeding—namely, that James Hendry, the named inventor of the '637 patent, did not derive his overflow wells process from work he did with Matthew Sayer while employed as a consultant for Cinpres in the mid–1980s. In opposition to this motion, Defendants cite a number of reasons why, in their view, the doctrine of issue preclusion should not apply here—because of the administrative character of the U.K. proceeding, for example, or because of purported evidentiary and procedural defects in that proceeding. More generally, Defendants contend that the factual issues resolved in the U.K. proceeding are legally irrelevant to the claims before this Court, so that the ruling sought through Plaintiff's motion would be tantamount to an advisory opinion. The Court finds this latter contention persuasive, and thus need not decide whether the elements of issue preclusion otherwise would be satisfied here.

Before turning to the merits of Plaintiff's motion, it is important to recall the precise nature and context of the U.K. patent proceeding. Following James Hendry's application for the international counterpart to the '637 patent, Defendants responded by commencing an administrative proceeding under section 12(1) of the United Kingdom Patent Act, through which they challenged Hendry's claim of inventorship and contended instead that Cinpres employee Matthew Sayer was the true inventor of the overflow wells process disclosed in the patent. The central factual inquiry in this U.K. proceeding was whether Hendry had learned of the over-flow wells process from Sayer while employed as a consultant for Cinpres, or whether he had independently derived this process after concluding his work with Cinpres. Upon hearing the evidence on this issue, the administrative officer found that Defendants had "failed to establish their case that Mr. Hendry learned of this [overflow wells] process while he was working with them as a consultant and that he took the knowledge of it with him when he left them at the end of 1985." (Plaintiff's Motion, Ex. E, 5/22/1996 U.K. Patent Office Decision at 31.) Thus, the hearing officer rejected Defendants' challenge to Hendry's claim of inventorship of the international counterpart to the '637 patent.

Despite Defendants' express identification of the relevancy issue, Plaintiff has wholly failed to suggest how the findings in this U.K. proceeding have any bearing upon the claims before this Court. Simply stated, the inventorship of the '637 patent is not at issue here, because the October 6 letter at the heart of this case does not address the issue of inventorship. Rather, this letter addresses the entirely distinct issue of Defendants' purported right to license the use of technology that includes overflow wells. These two matters are intertwined only if one assumes that the '637 patent fully occupies the field of overflow wells, and that Defendants cannot license the use of *any* process using overflow wells without infringing the '637 patent.

Plaintiff has not offered any evidence or argument in support of this proposition. Instead, it seeks to blur the two distinct issues of inventorship of the '637 patent and the right to license the overflow wells process. Plaintiff, for example, broadly characterizes the findings in the U.K. proceeding as having established "that Cinpres is not the inventor of, and has no

rights in, the overflow wells process." (Plaintiff's Motion, Br. in Support at 2.) As explained, this proceeding *at most* established that Cinpres is not entitled to claim inventorship of the particular process disclosed in the '637 patent, based on the factual finding that James Hendry did not learn of this process while employed at Cinpres.

Consequently, the findings in the U.K. proceeding fail the threshold test of relevancy—that is, they do not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The central issue in this case is the truth, falsity, or misleading nature of the various statements in the October 6 letter. Upon careful scrutiny of each of these statements, the Court fails to discern any way in which the U.K. Patent Office findings would make any of these statements more likely false or misleading.[15] Paragraph five presents the closest call, with Jordan claiming that Defendants have the right to grant licenses which include the use of overflow wells. As explained earlier, however, this statement would not be actionable as a mere expression of Jordan's opinion—it is problematic only in light of the preceding representations as to matters of fact, matters which

have nothing whatsoever to do with the U.K. Patent Office proceeding or its findings. Moreover, the U.K. findings do not tend to defeat Jordan's entitlement to hold the "opinion" arguably stated in paragraph five because, as Defendants note and Plaintiff concedes, no court or administrative tribunal has ever held that Defendants' use or licensing of overflow wells infringes the '637 patent.[16]

This brings the Court back to its central concern with Plaintiff's motion—namely, that it seeks to place the Court's imprimatur on Plaintiff's view as to the scope of the '637 patent. The factual findings of the U.K. Patent Office on pure patent issues would bear upon the claims presented here *only if* the '637 patent were deemed to completely "occupy the field" of overflow wells. This, in turn, would lead to the conclusion that Defendants infringe this patent through use of any process involving overflow wells. By giving the U.K. findings preclusive effect here, the Court would necessarily accept the unstated premise that lurks behind Plaintiff's motion—namely, that the '637 patent has the broad scope that Plaintiff believes it does. The Court declines Plaintiff's invitation to inject such patent construction issues into this case, where nothing in the October 6 letter or the governing Lanham Act law requires the Court to do so, where

---

**15.** Indeed, it would appear that these findings lend a degree of support to paragraph one of the October 6 letter, in which Steven Jordan claims that Defendants have incorporated the use of overflow wells in the Cinpres Technology package since 1985. Though Plaintiff misleadingly suggests in its briefs that the U.K. findings call this claim into question, the Patent Office decision expressly states that Defendants "did during 1985 develop the use of overflow runners or pockets," and it further accepts "the premise that this process did effectively anticipate the claims of the patent application in suit." (Plaintiff's Motion, Ex. F, U.K. Patent Office 5/22/1996 Decision at 31.) Defendants' U.K. challenge did not fail

on this "first use" basis, but for lack of proof that James Hendry learned of this process while working for Cinpres in 1985.

**16.** In this regard, there is a tension between the positions taken by Plaintiff in support of its own motion and in opposition to Defendants' motion. As to the latter, Plaintiff denies that the October 6 letter should be construed as Jordan's opinion on the open issue whether Defendants have infringed the '637 patent. Yet, as to Plaintiff's own motion, the U.K. findings seemingly are relevant here only if the October 6 letter is construed as offering an opinion on the patent infringement issue.

808

the record and arguments presented by the parties would in no way prepare the Court for the task of claim construction, and where the patent litigation that has now been commenced by the parties provides a far more suitable forum for such an undertaking.[17]

## IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' May 14, 2003 Motion for Summary Judgment is DENIED. IT IS FURTHER ORDERED that Plaintiff's April 29, 2003 Renewed Motion to Accord Preclusive Effect to the Decision of the British Courts that the Patented Overflow Wells Process Was Not Derived from Cinpres is DENIED.

Next, IT IS FURTHER ORDERED that Defendants' June 3, 2003 Motion for Leave to File a Motion for Summary Judgment Based on Plaintiff's Amended Complaint is DENIED AS MOOT. Finally, IT IS FURTHER ORDERED that Defendants' October 14, 2003 Motion for Leave to File Supplemental Memorandum is DENIED AS MOOT.

17. In light of this ruling, Defendants' eleventh-hour motion to file a supplemental memorandum, submitted just two days before the scheduled October 16, 2003 hearing on the parties' summary judgment motions, is now moot. In this motion, Defendants identify two recent developments that purportedly militate against according preclusive effect to the U.K. findings: (i) the recent decision of the European Patent Office to revoke the European counterpart to the '637 patent; and (ii) the allegations recently made by Defendants to the U.K. Patent Office suggesting that

Mr. Hendry's testimony in the prior U.K. proceeding was coerced. Though the Court need not resolve this matter, it fails to see how the factual findings in the U.K. proceeding are in any way undermined by a decision to revoke the European counterpart to the '637 patent on an apparently unrelated ground. Nor would the Court be inclined to give great weight to Defendants' latest allegations of impropriety, given the parties' long and contentious history of disputes regarding the '637 patent and the overflow wells process.